No. 25-60163

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ELIJAH PORTER,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-CR-11-1

---

## BRIEF FOR APPELLANT ELIJAH PORTER

---

**Omodare B. Jupiter** (MB #102054)
Federal Public Defender
Northern and Southern Districts
of Mississippi
2510 14th St., Suite 902
Gulfport, MS 39501
Telephone:  (228) 865-1202
Facsimile:   (228) 867-1907
Omodare_jupiter@fd.org

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS
*United States v. Porter*,
No. 25-60163

The undersigned certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case:

1. The Honorable Taylor McNeel, United States District Judge, Gulfport, Mississippi;

2. Elijah Porter, Defendant-Appellant;

3. United States of America, Plaintiff-Appellee;

4. Counsel for Plaintiff-Appellee: Acting United States Attorney Patrick Lemon; and Assistant United States Attorneys Hunter McCreight, Gaines Cleveland;

5. Counsel for Defendant-Appellant: former Assistant Federal Public Defender Lauren Hillery (trial counsel); Federal Public Defender Omodare Jupiter (appellate counsel); and Research & Writing Specialist Victoria McIntyre.

This certification is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ *Omodare B. Jupiter*
**Omodare B. Jupiter**
Federal Public Defender

i

## REQUEST FOR ORAL ARGUMENT

This appeal raises serious issues concerning the constitutionality of a traffic stop premised solely upon an alert generated by an automatic license plate reader. It additionally challenges the constitutionality of the machinegun prohibition under the Second Amendment. Mr. Porter requests oral argument and believes it would aid this Court in consideration of the facts and analysis of the issues raised within.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................i

REQUEST FOR ORAL ARGUMENT ................................................... ii

TABLE OF CONTENTS........................................................................ iii

TABLE OF CITATIONS ........................................................................ v

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE.................................................................3

SUMMARY OF THE ARGUMENT .....................................................6

ARGUMENT...........................................................................................8

I.    The district court erred by denying Mr. Porter's motion to suppress evidence resulting from the warrantless search of his vehicle. ......................8

   A.    Standard of Review..............................................................8

   B.    The Fourth Amendment prohibits unreasonable searches and seizures. ...............................................................................9

   C.    There was no reasonable suspicion to support a stop of the vehicle Mr. Porter was driving............................................10

   D.    The warrantless search of the vehicle was not justified by the plain view doctrine. ..........................................................21

   E.    The warrantless search of the vehicle was not justified by the inevitable discovery doctrine. ...........................................29

II.   The district court erred by denying Mr. Porter's motion to suppress the evidence of vehicle location data. .................................................31

   A.    Standard of Review............................................................31

   B.    The ALPR scan constituted a search under the Fourth Amendment because Mr. Porter had a reasonable expectation of privacy in his location and movements. .................................................32

III.  Section 922(o) facially violates the Second Amendment.............................38

   A.    Standard of Review............................................................39

B.    *Bruen* "fundamentally changed" the framework for analyzing
      Second Amendment challenges. ........................................................39

C.    The Second Amendment's plain text covers the conduct
      proscribed in § 922(o)......................................................................40

D.    *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) no longer governs
      this Court's analysis.........................................................................41

E.    There is no historical tradition justifying the modern machinegun
      ban imposed by § 922(o). .................................................................45

F.    Machineguns are not "dangerous and unusual." ................................47

G.    Section 922(o) is unconstitutional as applied to Mr. Porter. ..............49

CONCLUSION....................................................................................................50

CERTIFICATE OF SERVICE .............................................................................51

CERTIFICATE OF COMPLIANCE ....................................................................52

# TABLE OF CITATIONS

## Cases

*Alabama v. White*, 496 U.S. 325 (1990)......................................................13, 17, 21

*Arizona v. Hicks*, 480 U.S. 321 (1987)....................................................................24

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)...............................................50, 54

*Carpenter v. United States*, 585 U.S. 296 (2018)............................................passim

*Delaware v. Prouse*, 400 U.S. 648 (1979) ..............................................................39

*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)..............................passim

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ..............................53

*Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003)........................................................14

*Florida v. J.L.*, 429 U.S. 266 (2000) ........................................................................22

*Florida v. Wells*, 495 U.S. 1 (1990) .........................................................................33

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015)..................53

*Gray v. Shelby County, Tennessee*,
    Nos. 22-5542/5543/5544, 2023 WL 5237373 (6th Cir. Aug. 15, 2023) .............14

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)...................................................passim

*Illinois v. Gates*, 462 U.S. 213 (1983).....................................................................21

*In re Bonvillian Marine Servs., Inc.*, 19 F.4th 787 (5th Cir. 2021)...................47, 49

*Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717 (5th Cir. 2004)........................49

*Kansas v. Glover*, 589 U.S. 376 (2020).......................................................15, 16, 17

*Katz v. United States*, 389 U.S. 347 (1967)......................................................10, 35

*Kyllo v. United States*, 533 U.S. 27 (2001) .............................................................36

*Leaders of a Beautiful Struggle v. Baltimore Police Department*,
    2 F.4th 330 (4th Cir. 2021) ...................................................................................42

*Navarette v. California*, 572 U.S. 393 (2014) .........................................................21

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)...................passim

*New York v. Class*, 475 U.S. 106 (1986)..................................................................24

*Scott v. Harris*, 550 U.S. 372 (2007)........................................................................32

*Terry v. Ohio*, 392 U.S. 1 (1968) ...............................................................10, 11, 23

*United States v. Alvarez*, 40 F.4th 339 (5th Cir. 2022)....................................passim

*United States v. Andrews*, 22 F.3d 1328 (5th Cir. 1994)........................................33

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024)................................50, 51

*United States v. Cortez*, 449 U.S. 411 (1981)....................................................11, 23

*United States v. Daniels*, 124 F.4th 967 (5th Cir. 2025).........................................43

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ................................45, 47, 49

*United States v. Garcia-Lopez*, 809 F.3d 834 (5th Cir. 2016)................9, 31, 32, 35

*United States v. Gonzalez*, 190 F.3d 668 (5th Cir. 1999) ................................19, 21

*United States v. Guerrero-Barajas*, 240 F.3d 428 (5th Cir. 2001) ..........................9

*United States v. Hensley*, 469 U.S. 221 (1985) ......................................13, 14, 19, 20

*United States v. Hill*, 752 F.3d 1029 (5th Cir. 2014)....................................9, 10, 11

*United States v. Hope*, 102 F.3d 114 (5th Cir. 1996) ..............................................33

*United States v. Ibarra*, 493 F.3d 526 (5th Cir. 2007)............................................19

*United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005).................................9, 18, 21

*United States v. Jones*, 565 U.S. 400 (2012).....................................................25, 40

*United States v. Lopez-Moreno*, 420 F.3d 420 (5th Cir. 2005).............................11

*United States v. Martinez*, 486 F.3d 855 (5th Cir. 2007)..................... 10, 12, 23, 35

*United States v. McBrown*,
    149 F.3d 1176, 1998 WL 413981 (5th Cir. 1998)..............................................17

*United States v. McKinney*, 980 F.3d 485 (5th Cir. 2020)..................................9, 11

*United States v. McKinnon*, 681 F.3d 203 (5th Cir. 2012) .....................................33

*United States v. Miller*, 307 U.S. 174 (1939) ..................................................48, 49

*United States v. Rahimi*, 602 U.S. 680 (2024)........................................................51

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023),
    *rev'd and remanded*, 602 U.S. 680 (2024)..........................................................45

*United States v. Ryles*, 988 F.2d 13 (5th Cir. 1990) ..............................................25

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024)....................................passim

*United States v. Vickers*, 540 F.3d 356 (5th Cir. 2008)..........................................20

*United States v. Waldrop*, 404 F.3d 365 (5th Cir. 2005)..................................24, 25

*United States v. Walker*, 49 F.4th 903 (5th Cir. 2022) ...........................................34

*United States v. Wilson*, 143 F.4th 647 (5th Cir. 2025)..........................................26

*United States v. Wright*, 57 F.4th 524 (5th Cir. 2023)............................................32

*Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560 (1971)......................20

*Whren v. United States*, 517 U.S. 806 (1996)...................................................32, 33

## Statutes

18 U.S.C. § 922(o) ........................................................................... passim

18 U.S.C. § 5032 ....................................................................................... 3

26 U.S.C. § 5845 ........................................................................... 5, 43, 46

28 U.S.C. § 1291 ...................................................................................... 1

FED. R. APP. P. 4 ....................................................................................... 6

Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 ....................... 52

Miss. St. § 45-9-101 ............................................................................... 26

U.S.S.G. § 2A2.2 ..................................................................................... 5

U.S.S.G. § 2K2.1 ..................................................................................... 5

## Constitutional Provisions

U.S. Const. amend. II ............................................................................. 38

U.S. Const. amend. IV ............................................................................. 9

## Other Authorities

*Privacy Impact Assessment for the CBP License Plate Reader Technology*
(July 6, 2020)
https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp049a-
cbplprtechnology-july2020.pdf .......................................................... 34

## STATEMENT OF JURISDICTION

Elijah Porter was convicted of 18 U.S.C. § 922(o) after a bench trial on August 20, 2024.  ROA.307.  The United States District Court for the Southern District of Mississippi entered judgment of conviction and sentence in this case on March 26, 2025.  ROA.136-42 (corrected judgment).  Mr. Porter filed a timely notice of appeal on September 16, 2024.  ROA.187.  This Court has jurisdiction under 28 U.S.C. § 1291, which confers jurisdiction on the courts of appeals from final decisions of the district courts.

## STATEMENT OF THE ISSUES

**ISSUE ONE:** Whether the district court erred by denying Mr. Porter's motion to suppress where the officer conducted an illegal search in violation of his Fourth Amendment rights.

**ISSUE TWO:** Whether the district court erred by denying Mr. Porter's motion to suppress the warrantless search of Mr. Porter's vehicle location data.

**ISSUE THREE:** Whether the district court erred by denying Mr. Porter's motion to dismiss the indictment where 18 U.S.C. § 922(o) facially violates the Second Amendment.

**ISSUE FOUR:** Whether the district court erred by denying Mr. Porter's motion to dismiss the indictment where 18 U.S.C. § 922(o) violates the Second Amendment as applied to him.

## STATEMENT OF THE CASE

Elijah Porter was arrested pursuant to a traffic stop on January 25, 2024. ROA.43.  When Mr. Porter was driving westbound on U.S. Highway 90 in Gautier, Mississippi in his brother's car, an automatic license plate reader (ALPR) triggered an alert indicating that the vehicle was associated with a wanted person.  ROA.43. Based solely on the ALPR alert, a Gautier Police Officer stopped Mr. Porter and detained him while he waited for confirmation of the validity of the warrant. ROA.43.  After detaining Mr. Porter, the officer went in and around the driver's seat area at least three times, removing the keys from the ignition, removing Mr. Porter's ear buds from his ear and placing them on the driver's seat, and reaching into the car to put the driver's side window up after it began raining.  ROA.43-44.  He also opened and began rummaging around the center console while still waiting for the return of the warrant.  ROA.44-45.  Eventually, the officer continued his search, reaching underneath the seat, and finding a firearm equipped with a Glock switch, or auto sear.  ROA.46.

Mr. Porter was charged by indictment on February 21, 2024 with one count of possession of a machinegun, in violation of 18 U.S.C. § 922(o).  ROA.152 (indictment).  He filed motions to suppress the firearm recovered by the warrantless search on two grounds.  First, he challenged the validity of the traffic stop and the warrantless search of the vehicle.  ROA.41-42 (motion to suppress), 43-53

(memorandum in support). Second, he challenged the warrantless search of the location and movement data of the vehicle Mr. Porter was driving. ROA.54-55 (motion to suppress), 68-74 (memorandum in support).

Mr. Porter additionally challenged the constitutionality of § 922(o) under the Second Amendment, both facially and as applied to him following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). ROA.56 (motion to dismiss), 58-67 (memorandum in support of motion to dismiss).

The district court heard the motions on July 8, 2024. *See* ROA.200-64 (transcript). At the close of the hearing, the district court reset the matter for a bench ruling later that week. ROA.262-63. When court was resumed, the district court denied the motion to suppress the vehicle location data and the motion to dismiss the indictment. ROA.158-59, 176-92. The district court took the motion to suppress the warrantless search of the vehicle under advisement and ordered supplemental briefing on the validity of the traffic stop. ROA.158-59, 176, 192-97.

The parties filed supplemental briefs. ROA.104-08 (Government's supplemental brief); ROA.108-19 (defendant's supplemental brief). The district court ultimately found that the initial traffic stop was lawful, denying the motion to suppress on that basis. ROA.266-67 (transcript); *see* ROA.120 (order).

Mr. Porter proceeded to a bench trial. *See* ROA.292-310. The parties stipulated to Mr. Porter's possession of a firearm equipped with a machinegun

4

conversion device and that the firearm qualified as a machinegun under the definitional statute, 26 U.S.C. § 5845.  ROA.125-26, 295-98, 300-01 (transcript).  The defense did not present any evidence, ROA.306, and the court found Mr. Porter guilty as charged, ROA.307; *see* ROA.136 (amended judgment).

The presentence report (PSR) applied the cross-reference in U.S.S.G. § 2K2.1(c)(1)(A), determined that the relevant substantive offense was aggravated assault, and applied the cross reference at U.S.S.G. § 2A2.2 to arrive at a base offense level of 24.  ROA.413 (PSR ¶ 41).  Mr. Porter's base offense level was decreased by three levels based on his acceptance of responsibility, resulting in a total offense level of 21.  ROA.413 (PSR ¶¶ 48-50).  With a criminal history category of I, his guidelines imprisonment range was 37 to 46 months of imprisonment.  ROA.414, 417 (PSR ¶¶ 53, 74).  The defense objected to the application of the cross reference and to the PSR's proposed reasons for departing upward in sentencing.  ROA.421-425.

At sentencing, the district court adopted the PSR and sentenced Mr. Porter to a 46-month term of imprisonment, to be followed by a three-year term of supervised release.  ROA.137-38 (judgment), 352, 375-76 (transcript), 498 (statement of reasons).  It also imposed a $3,000 fine.  ROA.134, 375.  Mr. Porter timely appealed.  ROA.11 (dkt. entries 57, 58), 143 (notice of appeal); ECF 1; *see* FED. R. APP. P. 4(b).

## SUMMARY OF THE ARGUMENT

Mr. Porter was seized pursuant to a traffic stop not because of any allegation he had committed a traffic violation, but instead because the vehicle he was driving (registered to his brother) was alleged to be "associated" with an individual with an outstanding warrant. This information was relayed via an ALPR alert that formed the sole basis of the traffic stop. At the time that Mr. Porter was seized, the officer had not confirmed the validity of the warrant and had no reason to believe that Mr. Porter was driving the vehicle to justify the stop. After detaining Mr. Porter, the officer further violated the Fourth Amendment by conducting a warrantless search of the vehicle resulting in the discovery of a firearm equipped with a switch. This warrantless search was unconstitutional and the district court erred by failing to suppress the firearm at issue. Moreover, the ALPR scan constituted a search under the Fourth Amendment because Mr. Porter had a reasonable expectation of privacy in his location and movements and the warrantless accessing of that information was unconstitutional.

Furthermore, § 922(o), criminalizing the possession of a "machinegun" violates the Second Amendment both facially and as applied to Mr. Porter's mere possession of a firearm equipped with a switch because the Government has not demonstrated a historical tradition justifying such infringement on his right to bear

arms. For the reasons stated within, this Court must reverse Mr. Porter's conviction and remand for further proceedings.

# ARGUMENT

**I.    The district court erred by denying Mr. Porter's motion to suppress evidence resulting from the warrantless search of his vehicle.**

**A.    Standard of Review**

When reviewing the denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Garcia-Lopez*, 809 F.3d 834, 838 (5th Cir. 2016). The evidence is viewed in the light most favorable to the prevailing party. *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). The reasonableness of an investigative stop is a question of law reviewed de novo. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005). The Government bears the burden of justifying a warrantless search. *Garcia-Lopez*, 809 F.3d at 838. This includes the burden of proving the specific and articulable facts that support the reasonableness of suspicion. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014); *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020). Evidence derived from an illegal search or seizure must be suppressed unless the Government can show "a break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation." *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007) (internal quotation marks and citation omitted).

**B.      The Fourth Amendment prohibits unreasonable searches and seizures.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. CONST. amend. IV, and a warrantless search is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted).  Traffic stops are deemed seizures for purposes of the Fourth Amendment and the legality of such a stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).  Under *Terry*, an officer may briefly detain a person only if the "officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime." *Hill*, 752 F.3d at 1033.

Under the two-part *Terry* inquiry, the officer's action must be (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.  For a traffic stop to be justified at its inception, an officer must have a reasonable suspicion that illegal activity occurred or was about to occur before stopping the vehicle. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  An officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.*   The reasonable

suspicion required under *Terry* is specific to the person who is detained; the circumstances "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see Hill*, 752 F.3d at 1033.

## C.    There was no reasonable suspicion to support a stop of the vehicle Mr. Porter was driving.

It is the Government's burden to demonstrate reasonable suspicion. *McKinney*, 980 F.3d at 490.  Reasonable suspicion must exist *before* initiating an investigatory detention. *Id*.  "Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) (internal quotation marks and citation omitted). Relevant facts may include a description of a suspect, a suspect's location and proximity to criminal activity, the timeliness of information, a suspect's behavior, and the officer's experience. *Id.* at 346.  Where a case involves an outstanding warrant—completed criminal activity—the information officers rely on must satisfy a higher level of specificity than if they were responding to a report of ongoing or very recent criminal activity. *Id.* at 347.

In finding that reasonable suspicion existed to justify the stop of the vehicle Mr. Porter was driving, the district court determined: (1) that the ALPR alert alone provided reasonable suspicion; (2) that the alert could provide reasonable suspicion without a physical description of Mr. Porter; and (3) that the collective knowledge

10

doctrine provided reasonable suspicion justifying the traffic stop. ROA.267.

Regardless of the theory under which the ALPR alert is analyzed, the record does

not provide sufficient evidence to demonstrate reasonable suspicion justifying the

traffic stop. Accordingly, the stop was unlawful and the evidence derived from the

illegal search and seizure must be suppressed. *See Martinez*, 486 F.3d at 864.

1.    *The ALPR alert did not provide the officer with sufficient information to justify the traffic stop.*

For information from law enforcement to support reasonable suspicion, the

basis for the information must be reliable. *Alabama v. White*, 496 U.S. 325, 330

(1990). The sole basis for the traffic stop was the ALPR alert generated when the

vehicle Mr. Porter was driving triggered a response on a license plate reader

stationed on the highway in Mississippi. ROA.227. The alert indicated that "a

vehicle [] has hit at a tag reader and that vehicle is associated with criminal activity."

ROA.205. When the officer ran the tag number, he was informed that the vehicle

was associated with two individuals: Stewart and EL Porter. ROA.207. The

Government failed to present evidence that the alert itself—upon which dispatch

relied to issue the BOLO—was supported by reasonable suspicion. *See United*

*States v. Hensley*, 469 U.S. 221, 232-33 (1985) (holding that an officer may make a

*Terry* stop based upon a bulletin only where the bulletin was "issued on the basis of

articulable facts supporting a reasonable suspicion").

There is no evidence in the record concerning the author of the alert. There is no evidence in this record that the author of the alert had a sufficient basis on which to conclude that its contents were accurate. There is no evidence in this record concerning how an association was made between Mr. Porter and the vehicle registered to Mr. Stewart. *See* ROA.220-23. The arresting officer admitted that he was not aware of the source of the information indicating that Mr. Porter was associated with or would be driving the vehicle and that he did not know how or when the information was put into the ALPR system. ROA.223. The information could have been generated from an anonymous tip. ROA.224. The information was not corroborated until well after the traffic stop occurred and Mr. Porter had been arrested. *See* ROA.216. Without additional evidence concerning the origin of the information that triggered the alert, the officer lacked reasonable suspicion justifying the traffic stop. Because there was no evidence that the information inputted into the ALPR was reliable, the *Terry* stop based entirely on the ALPR alert was unlawful. *See Hensley*, 469 U.S. at 232-33; *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (holding that stop based upon information from police dispatcher was unlawful where dispatcher lacked reasonable suspicion to support the stop), *abrogated on other grounds by Gray v. Shelby County, Tennessee*, Nos. 22-5542/5543/5544, 2023 WL 5237373, *2 n.1 (6th Cir. Aug. 15, 2023) (modifying qualified immunity analysis).

The cases that the district court cited to justify a finding of reasonable suspicion differ from the circumstances here. The district court's analysis and ultimate finding of reasonable suspicion began from a position of assuming the reliability of the information relayed by dispatch. Yet the record is devoid of any evidence supporting that reliability.

In *Kansas v. Glover*, 589 U.S. 376, 378 (2020), the Supreme Court upheld a traffic stop initiated after an officer ran a vehicle's license plate and learned that the registered owner was driving with a revoked driver's license. In that case, the officer knew that the registered owner of the vehicle had a revoked license and that the vehicle he observed matched the registration model. *Id.* at 381. The Court determined that from those facts, the officer could reasonably suspect that the driver "was potentially engaged in specific criminal activity—driving with a revoked license." *Id.* at 385. The officer had reasonable suspicion to believe that the driver was engaging in criminal activity *at that moment*, thereby justifying the traffic stop. *Id.*

The Court "emphasize[d] the narrow scope of [its] holding," maintaining that traffic stops do not "allow officers to stop drivers whose conduct is no different from any other driver's." *Id.* at 385-86. It explained that different facts might dispel reasonable suspicion. *Id.* at 386. In *Glover*, however, the officer had information to

13

believe that the individual, who he knew did not have a valid license, was currently driving his own truck—thus the stop was justified. *Id.*

The circumstances here are distinct from *Glover*. In *Glover*, the officer had reason to believe that the driver was currently committing a traffic violation at the time he initiated the stop. 589 U.S. at 385. The Court "recognized that States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicle and that licensing, registration, and vehicle inspection requirements are being observed." *Id.* at 381 (cleaned up).

In this case, however, there was no allegation that Mr. Porter had committed a traffic violation to justify the traffic stop. Instead, the officer conducted the traffic stop after receiving an "alert" on his cell phone that "a vehicle [had] hit at a tag reader and that vehicle is associated with criminal activity." ROA.204-05 (quote at 205). The officer explained that an alert may indicate that a vehicle is "in connection to a crime or missing person or wanted person," or a "stolen vehicle, person that is wanted, missing person, somebody that might be endangered, things of that nature." ROA.205. The alert sent the officer a picture of the vehicle and its tag, but he knew nothing about the alleged warrant, what Mr. Porter looked like, or if Mr. Porter was driving the vehicle, which was connected to multiple individuals. ROA.206-07, 218-26. The officer did not know where the information he received originated.

14

ROA.223. He did not know when the information was generated or whether it was

valid. ROA.224.

Reasonable suspicion "is dependent upon both the content of the information

possessed by police and its degree of reliability." *White*, 496 U.S. at 330. Even

where information is obtained through proper police channels, courts cannot

"blindly accept officers' reliance on information obtained through police channels;

the government must substantiate the basis of the information." *Alvarez*, 40 F.4th at

352. The Government failed to prove that the ALPR alert provided the officer with

sufficiently specific information to conduct the traffic stop. At the time that he

initiated the stop, the officer had no reliable information justifying the "association"

of Mr. Porter with his brother's car. Although there was a warrant for Mr. Porter's

arrest, the officer had no information that Mr. Porter owned the vehicle, regularly

used the vehicle, or had ever been seen driving the vehicle. *See Glover*, 589 U.S. at

389 (Kagan, J., concurring) ("Similarly, [] when the officer learns a car has two or

more registered owners, the balance of circumstances may tip away from reasonable

suspicion that the one with the revoked license is driving."). At the time he stopped

the vehicle, the officer had no physical description of Mr. Porter that could support

a finding of reasonable suspicion that he was the person driving the vehicle.[1] *See*

---

[1] In *United States v. McBrown*, 149 F.3d 1176, 1998 WL 413981, *10 (5th Cir. 1998)
(unpublished), by contrast, there was no dispute that there were outstanding arrest warrants for the

ROA.226; *Alvarez*, 40 F.4th at 348 (cleaned up) (finding that the subject's physical description was too general and vague to support reasonable suspicion where "[t]he officers did not have a photograph and did not otherwise know what the suspect looked like" and "[o]ther than race and sex, they knew of no descriptors—age, height, weight, identifying marks, or clothing); *Jaquez*, 421 F.3d 338, 341 (5th Cir. 2006) ("The sparse and broadly generic information provided by the dispatcher, without more, was insufficient to support a determination of reasonable suspicion, as required under *Terry*.").

2.    *The ALPR alert was insufficiently specific to provide reasonable suspicion to justify the traffic stop.*

Regardless of whether a be-on-the-lookout (BOLO) alert requires a physical description of the driver to provide reasonable suspicion, it does require more information than the officer had at the time he conducted the traffic stop at issue here. The record does not demonstrate that the ALPR alert independently created reasonable suspicion for the traffic stop. The officer's lack of a physical description was an additional omission amongst many other information gaps insufficient to support reasonable suspicion.

Whether an alert or BOLO provides reasonable suspicion necessary to justify an investigatory stop depends upon a number of factors (collectively referred to as

---

individual driving the vehicle and there was no indication that the vehicle was connected with or "associated" with other individuals.

the "*Gonzalez* factors"), including (1) the credibility and reliability of the informant, (2) the specificity of the information contained in the report, (3) the extent to which the information in the report can be verified by officers in the field, and (4) whether the report concerns active or recent activity or has gone stale. *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999).

The district court assumed without evidence that the information supporting the alert was tantamount to a tip from law enforcement, but even law enforcement tips are not, without more, sufficiently reliable to support reasonable suspicion to perform a traffic stop. The collective knowledge doctrine permits a stop at the direction of, or based on information relayed from, another law enforcement agency. *See Hensley*, 469 U.S. at 232-33. This doctrine applies where there is "some degree of communication between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). "Officers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin or a radio dispatch, if the information is based on articulable facts supporting a reasonable suspicion that the wanted person has committed an offense." *Alvarez*, 40 F.4th at 351-52. Critical to this doctrine is that the officer or agency relaying the information has reasonable suspicion to justify the stop. *Hensley*, 469 U.S. at 232. If the information "has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance

upon it violates the Fourth Amendment." *Alvarez*, 40 F.4th at 345-46 (quoting *Hensley*, 469 U.S. at 232); *see also Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) ("an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest").

In *Alvarez*, the arresting officer relied upon information received in a round-up packet. 40 F.4th at 352. Thus, the officer who issued the packet was required to have reasonable suspicion justifying a stop. *Id.* Yet, the arresting officer did not know who provided the information in the packet, and the Government did not introduce into evidence any details about the origin or the timeliness of the information therein to show that it was premised on articulable facts. *Id.* The Government, without substantiating the basis of the information, failed to establish reasonable suspicion that could have transferred between officers and the collective knowledge doctrine did not apply. *Id.*

"Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time." *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008). Here, the Government failed to substantiate the basis of the information transmitted through the ALPR alert known to the officer at the time he conducted the traffic stop. It failed to prove that the information relied upon came from a police channel, and it also failed to prove any details concerning the basis for

the information that would otherwise support its credibility. *See Alvarez*, 40 F.4th at 352; *Jaquez*, 421 F.3d at 341. There was accordingly no reasonable suspicion to support the stop.

At best, the information generated by the ALPR alert was akin to an anonymous tip. *See* ROA.224 (indicating that information could be input into the ALPR system from an anonymous tip). When considering an anonymous tip, the threshold question in determining whether the tip provided reasonable suspicion is whether it was "sufficiently reliable to credit the allegation," *Navarette v. California*, 572 U.S. 393, 398 (2014), considering an informant's "veracity," "reliability," and "basis of knowledge," *Illinois v. Gates*, 462 U.S. 213, 230 (1983). The factors governing the reliability of an anonymous tip mirror the "*Gonzalez* factors." *Compare Gonzalez*, 190 F.3d at 672, *with White*, 496 U.S. at 328-32. Thus, for the reasons stated within, the Government has also failed to meet its burden to support reasonable suspicion of an anonymous tip.

When an anonymous tip is neither supported by indicia of reliability nor corroborated with police observation, it cannot provide reasonable suspicion. *Florida v. J.L.*, 429 U.S. 266, 271 (2000). The ALPR identified a vehicle driving down the interstate allegedly "associated" with criminal activity. ROA.205. After receiving the alert, the officer ran it through dispatch and learned only that Mr. Porter had an outstanding warrant for aggravated assault. ROA.207. He did not know

19

where the warrant was from or whether it was valid. ROA.207. The Government produced no evidence concerning the whereabouts or the reliability of the information relayed by the ALPR machine. At the time of the alert, and after running the alert through dispatch, the officer knew only that there was a warrant connected to Mr. Porter, and that Mr. Porter was "associated" with a certain vehicle. ROA.206-07, 224. The warrant had not yet been confirmed at the time he initiated the stop. ROA.232-33. There was no information provided about the driver of the vehicle. ROA.225-26. Running the license plate provided contradictory information concerning the registration of the vehicle. ROA.222 (indicating that the officer was informed that the vehicle was registered to Stewart or EL Porter). No independent investigation was conducted and the officer did not verify the information before conducting the traffic stop. *See J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.").

There were no allegations that Mr. Porter committed a traffic violation supporting a traffic stop, that law enforcement was in "hot pursuit," that the vehicle had been stolen, or any other circumstances that would indicate that he was committing a crime justifying the stop. Allowing an ALPR hit identifying a vehicle allegedly associated with an individual connected to criminal activity, without more, to justify a traffic stop "invite[s] intrusions upon constitutionally guaranteed rights

based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

Reasonable suspicion does not allow for the cast of such a wide net. *See Alvarez*,

40 F.4th at 346; *Cortez*, 449 U.S. at 417-18 (reasonable suspicion requires

"particularized and objective" bases).

This Court has clearly instructed that the Government must substantiate the

basis of information allegedly supporting reasonable suspicion and that it will "not

blindly accept" officers' reliance on information obtained even through police

channels. *Alvarez*, 40 F.4th at 352. The record lacks evidence sufficient to

demonstrate the reliability of the information relayed by the ALPR alert so as to

provide justification for a lawful traffic stop. The evidence must accordingly be

suppressed. *Martinez*, 486 F.3d at 864.

**D.     The warrantless search of the vehicle was not justified by the plain view doctrine.**

Even assuming that there was reasonable suspicion to justify the stop, no

exception to the warrant requirement applies here. Under the plain view doctrine,

"a truly cursory inspection—one that involves merely looking at what is already

exposed to view, without disturbing it—is not a 'search' for Fourth Amendment

purposes. *Arizona v. Hicks*, 480 U.S. 321, 328 (1987). This doctrine justifies seizure

of evidence plainly in view without a warrant only if (1) the officers lawfully entered

the area where the items could be plainly viewed, (2) the incriminating nature of the

items was immediately apparent, and (3) the officers had a lawful right of access to the items. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

The first requirement is not met. The stop was illegal so there was no lawful right of access. Moreover, even if the stop had been valid, the officer had no right to access the interior space of the vehicle. "While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police." *New York v. Class*, 475 U.S. 106, 114-15 (1986). Thus, "an officer's momentary reaching into the interior of a vehicle [does] constitute a search," *United States v. Jones*, 565 U.S. 400, 410 (2012), and this Court has held than an officer conducts a search when "he pierce[s] the airspace inside the vehicle," *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1990).

After the officer confirmed that Mr. Porter was the driver of the vehicle, he detained him and patted him down for weapons. ROA.208. At this point, the warrant had not yet been confirmed, and the officer claimed that Mr. Porter was not under arrest. ROA.214-15. The officer, without a search warrant, intruded inside a space protected by a legitimate expectation of privacy.

Assuming that the stop was valid, before confirmation of the warrant, the officer would have had to view the firearm in plain view at the time he detained Mr. Porter for the doctrine to apply. *See Waldrop*, 404 F.3d at 368. The officer would

have also needed to see the Glock switch, or some indication that the firearm was apparently unlawful to possess.[2]  *See United States v. Wilson*, 143 F.4th 647, 658-59 (5th Cir. 2025) (holding that the mere possession of a firearm in a state with a shall-issue regime is not presumptively illegal).[3]  Before confirmation of the warrant, the officer had no basis to lawfully begin searching the vehicle.  *See* Part I(E), *infra*, addressing the lack of basis for the inventory search.

The officer's explanations of the circumstances under which he first viewed the firearm at issue are contradictory.  At each step—during the initial encounter preserved by the body camera evidence, as written in the police report, and as testified to during the motions hearing—the officer's explanation of how he found the firearm and what he saw changed.

---

[2] To the extent that the district court alternatively held that the incriminating nature of the firearm was immediately apparent because the officer knew that Mr. Porter had an outstanding warrant for an aggravated assault with a deadly weapon, ROA.172, such conclusion is both factually and legally erroneous.  First, the officer did not have confirmation of the warrant at the time that he recovered the firearm, ROA.216, and second, he testified that he believed that the warrant was for aggravated assault, not aggravated assault with a deadly weapon, ROA.207.  There was no evidence presented—and certainly not rising to the level of probable cause—that at the time of the stop, the officer had probable cause to believe that the weapon at issue was related to the alleged warrant for aggravated assault.

[3] Mississippi, like Louisiana, has a "shall issue" regime concerning the concealed carry of a handgun.  Miss. St. § 45-9-101(2) (mandating that a license "shall issue" to any Mississippi resident who meets the statutory requirements).

The officer was wearing his body worn camera throughout the traffic stop. After detaining Mr. Porter and removing him from the vehicle, the officer went in and around the driver's seat at least three times. ROA.44. The body camera footage reveals the officer's view of the driver's side seat with the items he removed from Mr. Porter's pockets placed on the seat. ROA.44. It further reveals the absence of any items visible under or around the base of the driver's seat. ROA.44.



ROA.44 (body camera, at 4:42).

Before recovering the firearm, the officer opened the center console and rummaged around.  ROA.44-45.



ROA.45 (body camera, at 5:32 showing the officer's arm in the center console).



ROA.45 (body camera, at 5:34 indicating the center console is now open).

It was not until the officer continued his search, reaching far underneath the seat, that he found the subject firearm.  ROA.46.



ROA.46 (body camera, at 5:48 illustrating the officer reaching under the seat).

As soon as the officer found the firearm, he exclaimed, "oh shit!"  Body camera, at 5:51.  He then gestured and asked for another officer to come over.  Body camera, at 5:55-5:59  When the other officer arrived, the investigating officer told him "there's a f****ing switch on that Glock."  Body camera, at 6:06-6:07.  The officer then called another officer on his cell phone and informed them he had found a gun equipped with an auto-sear and claimed that he found it "basically in plain view," with "the barrel sticking out from under the seat."  ROA.46 (body camera, at 8:18-8:24).  The officer walked back to his patrol car and asked Mr. Porter, "why didn't you tell me about the gun?," body camera, at 8:58, and informed Mr. Porter

that he had found the firearm sticking out from under the seat, ROA.46 (body camera, at 9:10). Only then did the officer ask the other officer on scene if he had an inventory sheet, body camera at 10:05-:06, and then call and ask dispatch to send an officer with an inventory sheet. ROA.46.

In his police report, he explained that he only discovered the firearm after he detained Mr. Porter and began to inventory the vehicle:

> I then detained Porter and had dispatch confirm the hit was valid. I took all property out of his pockets and placed Porter in my vehicle. I then went back to the vehicle to put some of the property in his seat for the time being until the hit was confirmed. While doing that and beginning to inventory the vehicle I saw the barrel of a Glock 19x sticking out from under the driver's seat where Porter was sitting.

ROA.51.

During the motions hearing, however, the officer claimed to see a firearm sticking out from under the seat *while he was first talking to Mr. Porter* in the vehicle. ROA.208-09. Crucially, he did not report seeing a "switch," but merely the barrel of a Glock. *Id.* He then said that he saw the slide of what he knew to be a Glock pistol. ROA.210. Later, he claimed to see the switch of an automatic Glock. ROA.215. The Government conceded that the firearm is not visible from the body camera footage and that the officer only saw the barrel of the firearm. ROA.254.

The district court found that the officer saw the firearm during his initial interaction with Mr. Porter. ROA.167. In determining that the firearm was in plain view, the district court found that although not visible from the body camera footage,

at the time that the officer asked Mr. Porter if he had any weapons, he somehow already knew that there was a firearm under the seat and that he was only asking the question to find out "if Mr. Porter was going to be honest with [him]." ROA.168. There is no reasonable view of the evidence to support this finding. *See Garcia-Lopez*, 809 F.3d at 838. This justification is belied by the body camera footage and the officer's actions after detaining Mr. Porter. If the officer had already seen the firearm equipped with a switch while speaking to Mr. Porter and detaining him, whether Mr. Porter was being honest with him or not would be irrelevant. A firearm equipped with a switch would have provided independent reason to arrest Mr. Porter and Mr. Porter's denial of possessing any weapons would be of no moment. And if he knew the firearm was there, why did he walk back and forth from the vehicle multiple times, leaving the firearm in an unlocked car, and then begin rummaging through the center console before retrieving the firearm? ROA.44-46, 228.

The officer's claim that he saw the firearm and knew Mr. Porter was lying is further contradicted by his actions after finding the firearm and exclaiming "oh shit!" and immediately flagging down a nearby officer to tell him and show him the gun. Body camera, at 5:51-6:07. And it is refuted by the police report which explains that he only noticed the Glock when beginning the inventory search. ROA.51.

"[V]ideo recordings are given a presumption of reliability and significant evidentiary weight because an electronic recording will many times produce a more

reliable rendition than will the unaided memory of a police agent." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (cleaned up); *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  The officer's testimony concerning the discovery of the firearm is not supported by a reasonable view of the evidence, and the district court's credibility finding constituted clear error.  *See Garcia-Lopez*, 809 F.3d at 838.

## E.    The warrantless search of the vehicle was not justified by the inevitable discovery doctrine.

The district court determined that the inevitable discovery doctrine justified the warrantless search of the vehicle because the officer would have found the firearm during an inventory search of the vehicle.  ROA.174.  This determination was erroneous because there was no lawful basis to conduct an inventory search at the time the firearm was discovered.

"An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage."  *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996).  Inventory searches exist outside of the warrant requirement because they serve "caretaking purposes" and "are not designed to uncover evidence of criminal activity."  *United States v. Andrews*, 22 F.3d 1328, 1334 (5th Cir. 1994).  Accordingly, an inventory search of a lawfully seized vehicle does not violate the Fourth Amendment if it is conducted pursuant to standardized

regulations and procedures consistent with the purposes of an inventory. *United States v. McKinnon*, 681 F.3d 203, 209 (5th Cir. 2012).

"[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Whren*, 517 U.S. at 811 (internal quotation marks and citation omitted). Thus, standardized criteria must regulate the opening of containers found when conducting an inventory. *Florida v. Wells*, 495 U.S. 1, 4 (1990). Crucially, "[i]t is beyond serious debate that the prosecution bears the burden of establishing that any evidence submitted, which resulted from an inventory search, was the result of a search conducted in accordance with known, established police procedures." *United States v. Hope*, 102 F.3d 114, 117 (5th Cir. 1996).

The threshold requirement of an inventory search is a lawful arrest. The record is clear that at the time that the officer began an "inventory search," the warrant against Mr. Porter had not yet been confirmed. ROA.214-16. The officer explained that he was detaining Mr. Porter until the warrant was confirmed and that he was not under arrest. ROA.214-15. Accordingly, at the time the officer began "inventorying," there was no valid basis to impound or seize the vehicle as there was no indication that Mr. Porter committed any crime. Such action was also against the Gautier Police Department's written policy concerning inventory searches on vehicles, which allows for the search of a vehicle "whenever the person is placed

under arrest." ROA.215. While the officer later claimed that he had seen the firearm before beginning the inventory, this claim is contradicted by the evidence and prior testimony, as detailed *supra*. Moreover, the officer's own testimony indicated that the towing of the car was only inevitable "once I confirmed the warrant." ROA.232. In the absence of a lawful inventory search, it was not inevitable that the firearm would have ultimately been discovered. *Compare United States v. Walker*, 49 F.4th 903, 909 (5th Cir. 2022) (finding the inevitable-discovery doctrine applied to evidence discovered in a vehicle where the arrest was valid and the officers were required to conduct an inventory search of the vehicle following arrest). Thus, the inevitable discovery doctrine does not justify the warrantless search.

The record reflects that the warrantless search of the firearm did not fall within an exception to the warrant requirement. Accordingly, the firearm should have been suppressed. *See Martinez*, 486 F.3d at 864. This Court must reverse.

## II.   The district court erred by denying Mr. Porter's motion to suppress the evidence of vehicle location data.

### A.   Standard of Review

When reviewing the denial of a motion to suppress, the district court's factual findings are reviewed for clear error and its legal conclusions de novo. *Garcia-Lopez*, 809 F.3d at 838. The Government bears the burden of proof to justify a warrantless search. *Id.*

**B.    The ALPR scan constituted a search under the Fourth Amendment because Mr. Porter had a reasonable expectation of privacy in his location and movements.**

"[T]he Fourth Amendment protects people, not places." *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *Katz*, 389 U.S. at 351). The Fourth Amendment seeks to secure "the privacies of life against arbitrary power" and "to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305 (internal quotation marks and citations omitted).

In *Carpenter*, the Supreme Court held that the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records and cell-site location information (CSLI) that provide a comprehensive chronicle of the user's past movements. *Id*. at 316, 320. In so holding, the Court highlighted several fundamental Fourth Amendment "guideposts." *Id.* at 305. It explained that "a central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Id.* (internal quotation marks and citation omitted). The Court considers this motivation when applying the Fourth Amendment to innovations in surveillance tools, thus, where "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, [the] Court has sought to 'assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'' *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 32 (2001)).

32

It is axiomatic that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 585 U.S. at 310.  When considering CSLI in *Carpenter*, the Court noted that "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period" and that to allow Government access to cell-site records "contravenes that expectation." *Id.* at 310-11 (internal quotation marks and citation omitted).  It ultimately determined that given the Fourth Amendment implications, the acquisition of the defendant's CSLI was a search that must generally be obtained only by means of a warrant supported by probable cause. *Id.* at 316.  In so holding, the Court reiterated its obligation, "as subtler and more far-reaching means of invading privacy have become available to the Government—to ensure that the progress of science does not erode Fourth Amendment protections." *Id.* at 320 (internal quotation marks, citation, and alterations omitted).  Therefore, the Court "decline[d] to grant the state unrestricted access to a wireless carrier's database of physical location information." *Id.*

Notably, the Court determined that the fact that the information was voluntarily provided to a third party was not dispositive.  A warrant is required "where the suspect has a legitimate privacy interest in records held by a third party." *Carpenter*, 585 U.S. at 319.  The Court rejected the Government's "primary

contention" that, under the third-party doctrine, "cell-site records are fair game because they are 'business records' created and maintained by the wireless carriers." *Id.* at 313. "In light of the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection, the fact that such information is gathered by a third party does not make it any less deserving of Fourth Amendment protection." *Id.* at 320.

ALPRs, which "consist[] of high-speed cameras and related equipment mounted on vehicles or in fixed locations that automatically and without direct human control locate, focus on, and photograph license plates and vehicles that come into range of the device," are used by local, state, and federal authorities, as well as private companies. ROA.68-69 (citing *Privacy Impact Assessment for the CBP License Plate Reader Technology* (July 6, 2020), 1, https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp049a-cbplprtechnology-july2020.pdf). The license plate number is converted into a computer-readable format and uploaded to a searchable database. ROA.69. ALPR systems may also capture a digital image of the license plate, the vehicle's make and model, the state or province of registration, the coordinates of the vehicle, and the date and time of the capture. ROA.69. The systems "may also capture (within the image) the environment surrounding a vehicle, which may include drivers and

passengers." ROA.69. This information is stored in databases and may be converted into reports.

Much like the technology discussed in *Carpenter*, the ALPRs at issue have "afforded law enforcement a powerful new tool to carry out its important responsibilities," yet "this tool risks Government encroachment of the sort the Framers, after consulting the lessons of history, drafted the Fourth Amendment to prevent," and therefore must be subject to the warrant requirement. 585 U.S. at 320 (internal quotation marks and citation omitted). The Supreme Court has long declared that "an individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *Delaware v. Prouse*, 400 U.S. 648, 662 (1979).

"When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, the Court has held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *United States v. Smith*, 110 F.4th 817, 830 (5th Cir. 2024) (cleaned up). Mr. Porter had an expectation of privacy in his location and movement data that was accessed without a warrant. *See Carpenter*, 585 U.S. at 310. Moreover, "individuals have a reasonable expectation of privacy in the whole of their physical movements" because of the "privacies of life" those movements reveal. *Id.* at 310-11 (internal quotation marks and citations

omitted).  The Court in *Carpenter* noted that CSLI, like the GPS data in *Jones*, "is detailed, encyclopedic, and effortlessly compiled." *Carpenter*, 585 U.S. at 309. "[L]ike GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools.  With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Id.* at 311.  It distinguished CSLI from GPS tracking in two important ways, however: (1) CSLI data was retrospective, *i.e.*, "the Government can now travel back in time to retrace a person's whereabouts"; and (2) CSLI data implicated everyone's privacy, not just those under investigation, and thus "this newfound tracking capacity runs against everyone." *Id.* at 312.

This Court recently applied the Supreme Court's reasoning in *Carpenter* to geofence location data that retroactively tracks anyone with their location history enabled. *Smith*, 110 F.4th at 831-36.  In *Smith*, this Court concluded that individuals have a reasonable expectation of privacy in their location history data, given its "intrusiveness and ubiquity." *Id.* at 836.  In so holding it determined that many of the concerns expressed by the *Carpenter* Court "are highly salient in the context of geofence warrants," especially the "potential for permeating police surveillance." *Id.* at 832-33 (internal quotation marks and citation omitted).

ALPR data implicates all the factors noted by *Carpenter* in finding that the use of historical cell site information implicates the Fourth Amendment: the detailed

nature of the data collected; the indiscriminate nature of the data collection; and the ability to conduct retrospective searches. The features of CSLI that concerned the *Carpenter* Court and the "remarkably cheap, easy, and efficient" means of obtaining data and tracking individuals' movements addressed in *Smith*, are present in ALPR data and technology, which tracks and collects data concerning the movements and locations of potentially any vehicle that ventures onto public roads and highways. *Smith*, 110 F.4th at 833 (quoting *Carpenter*, 585 U.S. at 311)). This data, like CSLI, is accumulated retrospectively and "runs against everyone." *Carpenter*, 585 U.S. at 312. Although license plate data does not involve the "detailed chronicle of a person's physical presence compiled every day, every moment, over several years," *id.* at 315, it implicates privacy interests above and beyond traditional surveillance by allowing the Government to access a retrospectively accumulated wealth of data on the movements of any car. Moreover, unlike the data at issue in *Carpenter*, the primary purpose of the ALPRs is to determine the precise location and movement data of a vehicle at a specific time. "[L]ike GPS tracking of a vehicle, cell phone location information is detailed, encyclopedic, and effortlessly compiled." *Id.* at 309. The ALPRs at issue here have the same characteristics: they are on day and night and record not only the license plates of vehicles, but also provide information allowing law enforcement to access specific prior travel and location data. The officer can view a history of each time that a particular license plate passes a camera

and access archival information detailing prior location. ROA.225. This type of data is more precise and comprehensive than the data at issue in *Carpenter*. Because the ALPRs allow the Government to access an individuals' movements, accessing its data is a search, and its warrantless operation violates the Fourth Amendment. *See Carpenter*, 585 U.S. at 309-10; *Smith*, 110 F.4th at 836; *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 346 (4th Cir. 2021).

"[T]he potential intrusiveness of even a snapshot of precise location data should not be understated." *Smith*, 110 F.4th at 833. Because of the volume and amount of data stored, Mr. Porter had an expectation of privacy in his location and movements and the official intrusion into the private sphere of his vehicle location data constituted a search requiring a warrant supported by probable cause. *See id.* at 830. The warrantless stop of Mr. Porter based solely on ALPR data should have been suppressed because the search of the database and his movements occurred without a warrant.

## III.    Section 922(o) facially violates the Second Amendment.

The Second Amendment guarantees that "the right of the people to keep and bear Arms[] shall not be infringed." U.S. Const. amend. II. Section 922(o) makes it a crime to "transfer or possess a machinegun," as defined in § 5845(b). § 922(o)(1). Under the framework announced in *Bruen*, § 922(o) violates the Second Amendment both facially and as applied to Mr. Porter because the conduct

prohibited by the statute is covered by the Second Amendment's plain text and its blanket prohibition on possessing a "machinegun," as defined in § 5845(b), conflicts with the Nation's historic tradition of firearms regulations.

## A.    Standard of Review

This Court reviews constitutional challenges to a statute de novo. *United States v. Daniels*, 124 F.4th 967, 971 (5th Cir. 2025).

## B.    *Bruen* "fundamentally changed" the framework for analyzing Second Amendment challenges.

The Supreme Court has held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Following *Heller*, courts adopted a two-step analysis to determine the constitutionality of regulations restricting an individual's right to possess and carry weapons. *See, e.g., Hollis v. Lynch*, 827 F.3d 436, 446-47 (5th Cir. 2016). The first step required courts to determine whether the challenged law encroached upon a right protected by the Second Amendment; if it did, courts would then apply "means-end scrutiny" and analyze whether the law survived. *Id.*

The Court's decision in *Bruen* eliminated the second step as "one step too many," finding no support for means-end scrutiny in the Second Amendment context. 597 U.S. at 19. Under *Bruen*, when the plain text of the Second Amendment covers an individual's conduct, it is presumptively protected, and the

39

burden then shifts to the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 17-19, 24 (quote at 19). "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 24 (internal quotation marks and citation omitted).

While this Court has now repeatedly affirmed that "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment, rendering our prior precedent obsolete," it has not yet considered a preserved challenge to § 922(o) in the wake of *Bruen*. *United States v. Rahimi*, 61 F.4th 443, 450-51 (5th Cir. 2023), *rev'd and remanded*, 602 U.S. 680 (2024) (*Rahimi I*); *see United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024) (same); *id.* (explaining that "[t]he law of orderliness mandates that we abandon that prior [pre-*Bruen* § 922(g)] precedent"). "Without precedent that conducts *Bruen*'s historical inquiry into our Nation's tradition of regulating [machinegun possession], [it] must do so [itself]." *Diaz*, 116 F.4th at 466.

## C.    The Second Amendment's plain text covers the conduct proscribed in § 922(o).

The Second Amendment extends, prima facie, to all "bearable arms," regardless of their existence at the time of the Founding. *Bruen*, 597 U.S. at 28. In *Heller*, the Court defined "arms" as "weapons of offence," and it explained that the term applied to weapons not specifically designed for nor employed in military use.

40

554 U.S. at 581 (internal quotation marks, citation, and alterations omitted). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28.

Section 922(o) presents a complete ban on machinegun possession, excluding only transfer to or possession by or under the authority of the United States or State agencies and the lawful transfer or possession of a machinegun lawfully possessed prior to the enactment of the ban. The ban extends to "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." § 5845(b). "The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.* The plain text of the Second Amendment covers the conduct prohibited by § 922(o), thereby rendering the statute presumptively unconstitutional. *See Bruen*, 597 U.S. at 17, 24.

**D.**    ***Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) no longer governs this Court's analysis.**

In a pre-*Bruen* opinion, this Court considered a Second Amendment challenge to § 922(o), holding that machineguns did not receive Second Amendment

protection because they were "dangerous and unusual and therefore not in common use." *Hollis*, 827 F.3d at 451. *Hollis* long foreclosed Second Amendment challenges to § 922(o) under this Court's rule of orderliness, yet the case predates *Bruen*, "which established a new historical paradigm for analyzing Second Amendment claims." *Diaz*, 116 F.4th at 465. A panel of this Court may overturn another panel's decision under the rule of orderliness when it has "fallen unequivocally out of step with some intervening change in the law." *Id.* (quoting *In re Bonvillian Marine Servs., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)). This Court has held that *Bruen* constitutes such a change, mandating that it abandon prior precedent applying means-end scrutiny. *Diaz*, 116 F.4th at 465.

In response to Mr. Porter's motion to dismiss, the Government claimed that *Hollis* remains controlling. ROA.87-89. Yet, the analysis in *Hollis* is inconsistent with the mandates of *Bruen*. In *Hollis*, this Court did not first consider whether possession of a machinegun was covered by the Second Amendment's plain text. *See Bruen*, 597 U.S. at 17. Instead, it first considered "whether the challenged law impinge[d] *upon a right protected by the Second Amendment*." *Hollis*, 827 F.3d at 446 (internal quotation marks and citation omitted). In considering the *scope* of the right, the court went beyond the plain text of the Second Amendment's right to bear arms.

*Hollis*'s determination that machineguns were not protected by the Second Amendment relied on dicta-within-dicta: dicta in *Heller* discussing dicta in *United States v. Miller*, 307 U.S. 174, 179 (1939).[4]  In *Miller*, the Supreme Court considered whether the short-barreled shotgun ban in the National Firearms Act violated the Second Amendment.  307 U.S. at 175-78.  The Court's holding was linked to its consideration of "a well regulated militia": "In the absence of any evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."  *Id.* at 178.  It justified its finding with historical evidence surrounding militias, explaining that "ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time*."  *Id.* at 179 (emphasis added).

In *Heller*, the Court returned to *Miller*, reading it "to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  554 U.S. at 625.  *Heller* considered only the constitutionality of a ban on handgun possession in the home.  *Id.* at 635.  The Court

---

[4] "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment."  *Heller*, 554 U.S. at 623.  "The defendants made no appearance in the case, neither filing a brief nor appearing at oral argument; the Court heard from no one but the Government (reason enough, one would think, not to make that case the beginning and end of this Court's consideration of the Second Amendment)."  *Id.*

explained in its decision that it was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 626. Its comments recognizing potential limitations on the right were "mere dicta." *Diaz*, 116 F.4th at 466 (citing *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) (internal quotation marks and citations omitted) ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it.")).

In sum, although *Hollis* considered a Second Amendment challenge to § 922(o), the Second Amendment landscape has so changed that it has "fallen unequivocally out of step." *Bonvillian Marine*, 19 F.4th at 792. The weapon at issue in this case is a bearable arm covered by the plain text of the Second Amendment under *Bruen*'s first step. The question of whether the possession of allegedly "dangerous and unusual" weapons may lawfully be banned is not relevant to step one, but instead to the question of whether the prohibition is supported by a historical tradition. *See Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring) (explaining that the "dangerous and unusual" test "cannot be used to identify arms that fall outside the Second Amendment"). Because *Hollis* did not complete the required historical analysis mandated by *Bruen*, its finding that § 922(o) comports with the Second Amendment lacks any precedential weight. The

Constitute presumptively protects the conduct prohibited by § 922(o). Accordingly, the burden shifts to the Government to demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 17, 24.

**E.    There is no historical tradition justifying the modern machinegun ban imposed by § 922(o).**

To prove that a challenged regulation is consistent with the Nation's historical tradition of firearm regulation, the Government faces a "heavy burden, as the Second Amendment 'is *not* a second-class right.'" *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) (emphasis its own) (quoting *Bruen*, 597 U.S. at 70). In *Bruen*, the Court held that to justify a firearm law infringing on otherwise protected conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 24. *United States v. Rahimi* clarified that "[a] court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." 602 U.S. 680, 692 (2024) (internal quotation marks and citations omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id.*; *see Bruen*, 597 U.S. at 29. Yet, "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692.

45

For challenged and historical laws to be "relevantly similar" they must "share a common 'why' and 'how': they must both (1) address a comparable problem (the 'why') and (2) place a comparable burden on the right holder (the 'how')." *Connelly*, 117 F.4th at 274. Although the law need not be a "dead ringer" or "historical twin," it must comport with the principles underlying the Second Amendment. *Rahimi*, 602 U.S. at 692 (internal quotations marks and citation omitted).

Thus, the historical tradition test requires more than a broad declaration that relies on generalities. In *Bruen*, the Supreme Court engaged in a detailed analysis of statutes and regulations, giving priority to those in existence at the time the Second Amendment was ratified. *See* 597 U.S. at 30-34. It did so because "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35. Accordingly, courts must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35.

The ban proscribed by § 922(o) is inconsistent with our Nation's history and tradition. The history of banning machineguns is limited and relatively recent. Congress first passed § 922(o) in 1968, *see* Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213, and machineguns lawfully possessed before May 19, 1968 are

specifically excluded from prohibition by § 922(o)(2)(B).  Historical evidence from the late nineteenth century and the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 272 (2022) (stating that "how the States regulated" when a constitutional amendment was ratified is "the most important historical fact").

In response to Mr. Porter's motion to dismiss, the Government failed to demonstrate that the machinegun prohibition is consistent with the Nation's history of firearm regulation.  It claimed only, by reference to *Heller*, that there was a historical tradition of prohibiting "dangerous and unusual weapons" and that machineguns are "inherently dangerous and unusual weapons" and conversion devices "are particularly dangerous, unusual, and uncommon."  ROA.90-91.  But *Heller* admitted that it was not doing the historical tradition work required by *Bruen* today.  *See* 554 U.S. at 626.  The Government bears that burden, and it failed to meet it here.  *See Bruen*, 597 U.S. at 19.

## F.    Machineguns are not "dangerous and unusual."

Even if we assume that the Government has proven a historical tradition of prohibiting the carrying of dangerous and unusual weapons, machineguns do not fall within this ban.  All firearms are dangerous.  *See Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 409 (7th Cir. 2015) (observing that comparing the dangerousness

of firearms is a difficult task because "nearly as many people are killed annually with handguns in Chicago alone as have been killed in mass shootings . . . nationwide in more than a decade"). There is no question that the potential dangerousness of a weapon cannot justify its total prohibition. *See Bruen*, 597 U.S. at 47; *Caetano*, 577 U.S. at 418 (Alito, J., concurring).

The next question would be whether machineguns are unusual. Machineguns have been in existence for over a century and a blanket prohibition on possession was not imposed until passage of the Firearms Owners Protection Act in 1986. And even then, § 922(o) merely prohibits possession of machineguns *not lawfully possessed as of the date that prohibition went into effect*. § 922(o)(2)(B). Thus, today, it is legal for an individual to acquire and possess a machinegun as long as it was lawfully possessed by another prior to the relevant date in 1986, and as long as he complies with the National Firearms Act's requirements to obtain and possess the weapon. Machineguns are not unusual.

In *Hollis*, this Court considered unusualness through the lens of "common use." 827 F.3d at 448-50. It explained that the commonality of a firearm could be determined by considering "raw number, percentage and proportion, [and] jurisdiction-counting." *Id.* at 449. Applying that methodology to machineguns in 2016, this Court found that the ATF report Hollis provided showed only "175,977

pre-1986 civilian-owned machineguns in existence," and "Hollis does not have the number to support his claims." *Id.* at 449-50.

The Government does not challenge Mr. Porter's assertion that the number of machineguns currently in use is likely significantly higher than 741,146—greater than four times the raw number considered in *Hollis*. *See* ROA.60, 90; *Hollis*, 827 F.3d at 449. Instead, it claims that that that figure is "dramatically lower than the millions of firearms manufactured in the United States and imported into the United States over the past five years." ROA.90. That number, too, has increased since *Hollis* was decided. The point remains that the data considered in *Hollis* (as well as the analysis employed) has become obsolete and cannot be relied upon to answer the question of unusualness or common use today. The Government fails to meet its burden to demonstrate that possession of the weapon at issue here is lawfully prohibited under the Second Amendment.

## G. Section 922(o) is unconstitutional as applied to Mr. Porter.

The Government did not prove a historical tradition sufficient to justify the constitutional application of § 922(o) to Mr. Porter. It did not even respond to this argument in pretrial briefing. *See* ROA.86-91. In response to the argument that § 922(o) is facially unconstitutional, the Government included one sentence—without citing a specific statute or historical analogue—that the bearing of arms offensively or in a way that spreads "fear" or "terror" could be regulated. ROA.90. In contrast

with historical examples cited in *Bruen*, 597 U.S. at 46-50, § 922(o) is silent on the manner in which machineguns are carried or displayed. It criminalizes the mere possession of machineguns without regard to how the possessor uses them.

The indictment alleges only that Mr. Porter "possessed a machine gun." ROA.152. There is no allegation that Mr. Porter was brandishing the weapon at issue offensively; it was found underneath the seat of the vehicle he was driving. ROA.63. The Government has failed to meet its burden to demonstrate a historically analogous restriction to justify the application of § 922(o) to his conduct. Section 922(o) is unconstitutional as applied to him.

## CONCLUSION

For the reasons stated within, Mr. Porter submits that his conviction and sentence must be vacated.

Respectfully submitted,

s/ *Omodare B. Jupiter*
**Omodare B. Jupiter**
Federal Public Defender
Northern and Southern Districts
of Mississippi
2510 14th St., Suite 902
Gulfport, MS 39501
Telephone: (228) 865-1202
Facsimile: (228) 867-1907
Omodare_jupiter@fd.org

## CERTIFICATE OF SERVICE

I, Omodare B. Jupiter, certify that on August 22, 2025, a copy of the Brief for Appellant was served upon counsel for the appellee by notice of electronic filing with the Fifth Circuit CM/ECF System. A copy of this brief was also delivered via United States Mail, postage prepaid, to Defendant-Appellant Elijah Porter.

s/ *Omodare B. Jupiter*
**Omodare B. Jupiter**
Federal Public Defender

# CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(g)(1) and 5TH CIR. R. 32.3, the undersigned

certifies as follows:

1. This document complies with the type-volume limitations of FED. R. APP. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5TH CIR. R. 32.2, this document contains 11,195 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and 5TH CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size and Times New Roman type style in text and 12-point font size and Times New Roman type style in footnotes.

3. This brief was filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

4. This brief complies with the privacy-redaction requirements of 5TH CIR. R. 25.2.13 because it has been redacted of any personal data identifiers.

5. This brief complies with the electronic-submission requirement of 5TH CIR. R. 25.2.1 because it is an exact copy of the paper document.

6. This brief has been scanned for viruses with the most recent version of a commercial antivirus scanning program and is free of viruses.

s/ *Omodare B. Jupiter*
**Omodare B. Jupiter**
Federal Public Defender