# 25-60163

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellee*

v.

ELIJAH PORTER

*Defendant-Appellant*

FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION
1:24cr11TBM-BWR

## BRIEF OF APPELLEE

PATRICK A. LEMON
*Acting United States Attorney*
*Southern District of Mississippi*

GAINES H. CLEVELAND
Mississippi Bar Number 6300
*Assistant United States Attorney*

HUNTER L. MCCREIGHT
Georgia Bar Number 728770
*Assistant United States Attorney*
1575 Twentieth Avenue
Gulfport, Mississippi 39501
Telephone: (228) 563-1560

## STATEMEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument. Neither of the issues on appeal requires further elaboration. The claims address a straightforward suppression question and a Second Amendment challenge to the machinegun prohibition. The questions presented can be fully considered by relying on the record and the briefs. Oral argument would not significantly assist the Court in deciding this case. *See* FED. R. APP. P. 34(a)(2)(C); FIFTH CIR. R. 28.2.3.

# TABLE OF CONTENTS

PAGE

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUES ...........................................................2

STATEMENT OF THE CASE ..............................................................3

A.   Porter Is Wanted for Aggravated Assault in
     Crystal Springs, Mississippi ...................................................3

B.   Porter Is Located in Gautier, Mississippi ...................................3

     1.   The Ford Focus that Porter Was Driving Is Identified
          through a License Plate Reader ........................................3

     2.   During the Stop, a Gautier Police Officer Sees a Glock
          with a Switch Visible Under the Driver's Seat .....................4

     3.   The Car Is Inventoried After Porter's Arrest .......................7

C.   Porter Fails in his Effort to Suppress the Evidence and Challenge
     the 18 U.S.C. § 922(o) Charge on Second Amendment Grounds .........8

D.   Porter Is Convicted in a Bench Trial and Is Sentenced ..................9

SUMMARY OF THE ARGUMENT ........................................................10

ARGUMENT ...................................................................................11

I.  The District Court Properly Refused to Suppress the Firearm ............11

    A.  Standard of Review ..........................................................11

    B.  Applicable Law ...............................................................12

    C.  The Suppression Hearing and the Ruling ....................14

    D.  Discussion .......................................................................16

        1.  The License Plate Reader Was a Lawful Means for
            Determining Porter's Whereabouts....................................17

        2.  The Polcie Were Authorized to Conduct an
            Investigatory Stop Based on the Outstanding Warrant ...19

        3.  The District Court's Finding that the Officer Saw
            the Weapon in Plain View Is Entitled to Deference..........20

        4.  In Any Event, the Gun Would Have Been Discovered
            During an Inventory of the Car ...........................................25

II. The District Court Appropriately Held that a Glock with
    Machinegun-Conversion Kit as Referred to in 18 U.S.C. § 922(o)
    Is Not Protected by the Second Amendment .........................................26

    A.  Standard of Review ..........................................................26

    B.  Applicable Law ...............................................................27

    C.  Consideration of the Issue Below ...............................28

D.    Discussion ............................................................29

    1.    This Court's Precedent Holds that Machineguns
Are Not Entitled to Second Amendment Protection,
Foreclosing Porter's Claim ....................................29

    2.    In Any Event, Porter's Second Amendment Claim
Is Without Merit ...................................................31

CONCLUSION ...............................................................39

CERTIFICATE OF SERVICE ...........................................40

CERTIFICATE OF COMPLIANCE ....................................41

# TABLE OF AUTHORITIES

**Cases**                                                                    PAGE

*Alabama v. White*, 496 U.S. 325 (1990)................................................... 18

*Bezet v. United States*, 714 Fed.Appx. 336 (5th Cir. 2017) .................................29

*Class v. United States*, 583 U.S. 174 (2018)..........................................................26

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............... 27, 29, 31, 32, 35, 36

*Friedman v. City of Highland Park*, 136 S.Ct. 447 (2015) (Thomas, *J.*,
        dissenting from denial of *certiorari*) .......................................................34

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009) ....................................33

*Haynes v. United States*, 390 U.S. 85 (1968) ..........................................................33

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ..........................................28, 29, 33

*Horton v. California*, 496 U.S. 128 (1990)............................................................22

*Kansas v. Glover*, 589 U.S. 376 (2020) ................................................................. 18

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
        597 U.S. 1 (2022) ..................................................... 27, 30, 31, 32, 35, 36, 38

*Ostrewich v. Tatum*, 72 F.4th 94 (5th Cir. 2023),
        *cert. denied*, 144 S.Ct. 570 (2024)...............................................................26

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) ...............34

*Terry v. Ohio*, 392 U.S. 1 (1968)...........................................................................13

vi

**Cases** (*Continued*)                                    PAGE

*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013) ................................30, 31

*United States v. Alvarez*, 40 F.4th 33 (5th Cir. 2022) .........................12, 17, 18, 2

*United States v. Anderson*, 2024 WL 2829243 (5th Cir. 2024) ...........................12

*United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (en banc) .....................12

*United States v. Cortez*, 449 U.S. 411 (1981)...........................................................13

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024)..............................................27

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) .........................................32

*United States v. Garcia*, 99 F.4th 253 (5th Cir. 2024)............................................11

*United States v. Gibbs*, 421 F.3d 352 (5th Cir. 2005) ............................................20

*United States v. Gil*, 2024 WL 2186916 (5th Cir. 2024)........................................26

*United States v. Golding*, 332 F.3d 838 (5th Cir. 2003)........................................33

*United States v. Gonzalez*, 190 F.3d 668 (5th Cir. 1999) ......................................17

*United States v. Gray*, 2021 WL 2209462 (D.D.C. 2021) ....................................23

*United States v. Henry*, 37 F.4th 173 (5th Cir. 2022)............................................12

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ...........................................33

**Cases** (*Continued*)                                                            PAGE

*United States v. Hensley*, 469 U.S. 221 (1985) ..........................................13, 17, 20

*United States v. Howard*, 766 F.3d 414 (5th Cir. 2014)........................................26

*United States v. Jefferson*, 89 F.4th 494 (5th Cir. 2023)..................................12, 20

*United States v. Jennings*, 195 F.3d 795 (5th Cir. 1999) .....................................33

*United States v. Lopez*, 2 F.3d 1342 (5th Cir. 1993),
    *aff'd*, 514 U.S. 549 (1995) ...............................................................................33

*United States v. McKinnon*, 681 F.3d 203 (5th Cir. 2012) ..................................25

*United States v. Michalik*, 5 F.4th 583 (5th Cir. 2021) ........................................12

*United States v. Miller*, 307 U.S. 174 (1939) ...................................................31, 32

*United States v. O'Brien*, 560 U.S. 218 (2010) ......................................................33

*United States v. Ochoa*, 667 F.3d 643 (5th Cir. 2012) .........................................13

*United States v. One (1) Palmetto State Armory PA-15 Machinegun
    Receiver/Frame*, 822 F.3d 136 (3rd Cir. 2016) ............................................33

*United States v. Ovalle*, 2024 WL 4678881 (5th Cir. 2024) ................................29

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ..........................26

*United States v. Rahimi*, 602 U.S. 680 (2024)..........................................35, 36, 38

**Cases** (*Continued*)                                                              PAGE

*United States v. Riggins*, 2023 WL 2964408 (5th Cir. 2023) ...........................23

*United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014) ....................................16

*United States v. Rodriguez*, 564 F.3d 735 (5th Cir. 2009)..................................19

*United States v. Rodriguez*, 601 F.3d 402 (5th Cir. 2010)............................22, 24

*United States v. Rowson*, 652 F.Supp.3d 436 (S.D.N.Y. 2023) ..........................23

*United States v. Salerno*, 481 U.S. 739 (1987) .......................................................27

*United States v. Trevino*, 989 F.3d 402 (5th Cir. 2021).......................................13

*United States v. Walker*, 49 F.4th 903 (5th Cir. 2022) ...................................14, 25

*United States v. Zaleski*, 489 Fed.Appx. 474 (2d Cir. 2012) ..............................33

**Statutes and Rules**

18 U.S.C. § 922(o)................................................................ 8, 27, 29, 31, 32, 33, 38

18 U.S.C. § 924(a)(2) ..............................................................................................8

18 U.S.C. § 3231......................................................................................................2

26 U.S.C. § 5845(b)...............................................................................................27

28 U.S.C. § 1291......................................................................................................2

# TABLE OF AUTHORITIES (*Continued*)

**Statutes and Rules** (*Continued*)                                    PAGE

FED. R. APP. P. 34(a)(2)(C)............................................................. ii

FIFTH CIR. R. 28.2.3...................................................................... ii

**Other**

U.S. CONST. amend. II ...............................................................27, 31

H.R. REP. No. 19, 86th Cong., 1st Sess., at 2 .....................................33

H.R. REP. No. 83-1337 (1954) ..........................................................35

H.R. REP. No. 99-495 (1986) ............................................................35

S. REP. No. 90-1501 (1968) ..............................................................34

1328 Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.)..............35

Act of Nov. 1, 1692, ch. 18, § 6, in 1 *Acts and Resolves of
    the Province of Massachusetts Bay* 52-53 (1869) ......................... 37

Act of June 14, 1701, ch. 7, in 1 *Laws of New Hampshire* 679
    (Albert Stillman Batchellor, ed., 1904) .....................................37

Act of Nov. 27, 1786, ch. 21, in *A Collection of all such Acts of
    the General Assembly of Virginia, of a Public and Permanent Nature,
    as are now in Force* 33 (1794) ..................................................37

Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436................................37

**Other** (*Continued*)                                                                    PAGE

An Act Against Wearing Swords, &c., ch. 9, in Aaron Leaming
    & Jacob Spicer, *Grants, Concessions, and Original Constitutions*
    *of the Province of New Jersey* 289-90 (2d ed. 1881) ....................................38

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24
    (2d ed. 1792) (N.H.) ....................................................................................37

James Parker, *Conductor Generalis* 11
    (Robert Campbell printing 1792) (Pa.) .....................................................37

James Parker, *Conductor Generalis* 12 (1764) (N.J.) ..........................................37

James Parker, *Conductor Generalis* 12
    (Robert Hodge printing 1788) (N.Y.) ........................................................37

Joseph Greenleaf, *An Abridgment of Burn's Justice of*
    *the Peace and Parish Office*r, 12-13 (1773) (Mass.)...................................  37

1 Richard Burn, *The Justice of the Peace, and*
    *Parish Officer* 13-14 (2d ed. 1756)..............................................................36

4 William Blackstone, *Commentaries on the*
    *Laws of England* 148-49 (10th ed. 1787)  ..............................................32, 36

1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716) ...............36

William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.) ..................37

**TABLE OF AUTHORITIES** (*Continued*)

**Tables and Figures**                                          PAGE

*Figure 1*:     Image from GX 1 (3:00), showing officer placing
               Porter's personal items on the driver's seat.................................5

*Figure 2*:     Image from GX 1 (5:49) showing officer retrieving Glock
               with switch from below the driver's seat.....................................7

# 25-60163

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellee*

v.

ELIJAH PORTER

*Defendant-Appellant*

FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION
1:24cr11TBM-BWR

## BRIEF OF APPELLEE

## STATEMENT OF JURISDICTION

This is a direct appeal from a final judgment of conviction and

sentencing entered by the United States District Court for the Southern

District of Mississippi, following a bench trial before the Honorable Taylor

B. McNeel, United States District Judge, finding Elijah Porter guilty of

possessing a machinegun. ROA.9, R.E.1 (8/20/24 docket entry for finding of

guilt); ROA.136-42, R.E.8 (amended judgment).[1]  Porter filed a timely notice

of appeal. ROA.143, R.E.2.

The district court exercised its jurisdiction pursuant to Title 18,

United States Code, Section 3231.  This Court's jurisdiction is properly

invoked. *See* 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court properly refused to suppress the

challenged Glock pistol and accompanying machinegun conversion device

("switch") found under the seat of the car the defendant was driving when

he was pulled over following an alert that was issued based on a warrant

for his arrest, which weapon would have been discovered during an

inventory of the car in any event.

2.     Whether the district court properly held that the federal

prohibition against possession of a machinegun does not offend the Second

Amendment—both facially and as applied.

---

[1] "ROA.9" refers to page 9 of the Record on Appeal; "R.E." to the Record
Excerpts, cited by tab; "GX" to Government exhibit from the suppression hearing;
"PSR" to the presentence report; and "Br." to Porter's brief.

# STATEMENT OF THE CASE

## A. Porter Is Wanted for Aggravated Assault in Crystal Springs, Mississippi

In November 2023, the Crystal Springs Police Department responded to a report of a shooting at a nightclub. ROA.409 (PSR ¶ 13). After conducting an investigation, the police identified Porter as the shooter. ROA.409-11 (PSR ¶¶ 14-22). The police then obtained a warrant for Porter's arrest for aggravated assault. ROA.411 (PSR ¶¶ 23). *See* ROA.207 (Gautier dispatcher confirming Porter wanted in Crystal Springs).

## B. Porter Is Located in Gautier, Mississippi

### 1. The Ford Focus that Porter Was Driving Is Identified through a License Plate Reader

In January 2024, Lieutenant Charles Hoggard of the Gautier Police Department received an alert notifying him that a white Ford Focus associated with criminal activity had hit a tag reader on U.S. Highway 90. ROA.204-05 (hearing); ROA.410 (PSR ¶ 24). The alert identified its location and sent a photo that included the tag number. ROA.206. The dispatcher confirmed that the alert was based on a warrant for Porter for aggravated assault in Crystal Springs. ROA.207, 220. *See* ROA.125-26 (stipulation).

Lieutenant Hoggard located the car as it was turning from Highway 90 onto Gautier-Vancleave Road. ROA.208.  The officer then initiated a traffic stop and activated his body camera. ROA.206. *See* ECF # 39 (GX 1: body camera video); GX 1 (00:46).[2]

### 2.    During the Stop, a Gautier Police Officer Sees a Glock with a Switch Visible Under the Driver's Seat

After determining the driver was Porter, who was wanted for arrest for aggravated assault, the officer had Porter exit the car and "patted him down for weapons." ROA.208.  Porter denied having any weapons on him but the officer told Porter he was "gonna pull all this stuff out of your pockets." GX 1 (2:42).  Porter responded: "You go ahead." *Id*.

The officer asked if Porter had any weapons in the car and Porter answered: "No, sir." GX 1 (2:56).  After removing the items from Porter's pockets, the officer told him: "I'm gonna set all this down right here." GX 1 (2:59).  The officer then placed the items on the driver's seat. GX 1 (3:00).

---

[2] As the body camera video shows, the bodycam was evidently placed on the officer's right side, near his torso.  When speaking with the officer, Porter's eyes are focused well to the left of the camera's field of vision. *See, e.g.*, GX 1 (1:52-2:05).

Asked if he noticed anything inside the car during his interactions with Porter, the officer testified he saw "[a] firearm sticking out from under the seat." ROA.209. The officer saw "just the slide and the barrel and then the – the little silver switch on the back of it." ROA.210. The officer "knew it to be a Glock pistol when [he] looked at it." ROA.210. When the body camera video was played in court, the officer identified the timestamp for when he first saw the pistol. ROA.211. *See* GX 1 (3:02).



*Figure 1*: Image from of GX 1 (3:00), showing officer placing Porter's personal items on the driver's seat

The pistol was not visible in the body camera footage until it was later retrieved by the officer. *See* Figure 2 *supra* (GX 1—5:49).

After returning Porter's belongings to the driver's seat, the officer had multiple additional opportunities to view the passenger compartment. Immediately after the officer deposited the items in the car, Porter asked him: "Would you roll up my windows so my car won't get wet?" GX 1 (3:08).  The officer turned back to the driver's door and rolled up the power windows, giving him another opportunity to see the car's interior. GX 1 (3:11).  Later, Porter asked if the officer could "pull my cap off" and told him: "You can just put it in the car." GX 1 (3:48).  Still later, the officer grabbed an earbud from Porter, saying "I don't want it to fall out." GX 1 (4:20).  The officer then returned to Porter's car and placed the earbud on the driver's seat. GX 1 (4:42). *See* Br. 24 (citing GX 1 at 4:42) (first image of bodycam video included in Porter's brief).

After securing Porter in his patrol car, the officer walked back to the Ford Focus and opened the driver's door. GX 1 (5:20).  The officer felt around areas within reach of the driver's seat before reaching under the seat and retrieving the Glock. GX 1 (5:29-5:50). *See* Figure 2 *infra.*



*Figure 2:* Image from GX 1 (5:49) showing officer retrieving Glock
with switch from below the driver's seat; highlighting weapon

The officer notified the dispatcher that he had recovered a "Glock 19 with an auto sear," which makes it "fully automatic." GX 1 (7:35).   The officer reported that the gun with the switch was plainly visible—with the barrel "sticking out from under the seat." GX 1 (8:18).

### 3. The Car Is Inventoried After Porter's Arrest

After Lieutenant Hoggard confirmed with his dispatcher that the arrest warrant was valid and Porter was still wanted by Crystal Springs, he began doing his own inventory of the car. ROA.215-16.  The officer

explained that he had already seen the Glock with the switch under the

driver's seat but only later retrieved the gun. ROA.215.  The officer

testified that the Gautier Police Department has a written policy calling for

the inventory of the vehicle of anyone subject to arrest whose car will need

to be towed. ROA.215.

The officer then requested an inventory sheet. GX 1 (10:05).  Another

officer agreed to arrange for the inventory of the car. GX 1 (12:03).   Officer

Hoggard testified that the Ford Fusion was towed and subjected to an

inventory. ROA.216-17.

## C.	Porter Fails in his Effort to Suppress the Evidence and Challenge the 18 U.S.C. § 922(o) Charge on Second Amendment Grounds

Following his arrest, Porter admitted buying the machinegun

conversion device and installing it himself as well as testing it. ROA.126

(stipulation).  Based on his having a Glock pistol with a machinegun

conversion device, Porter was indicted for possessing a machinegun, in

violation of Title 18, United States Code, Sections 922(o) and 924(a)(2).

ROA.152-55, R.E.3.

Porter moved to suppress the weapon. *See* ROA.41 (motion); ROA.43-53 (memo in support); ROA.76-85 (Gov't response); ROA.92-96 (reply). Porter separately moved to suppress the evidence of the vehicle location data. *See* ROA.54-55 (motion); ROA.68-74 (memo in support). In addition, Porter moved to dismiss the indictment, challenging 18 U.S.C. § 922(o) on Second Amendment grounds and as exceeding Congress's power under the Commerce Clause. *See* ROA.56 (motion); ROA.58-67 (memo in support); ROA.86-91 (Gov't response); ROA.97-101 (reply).

The court conducted a hearing on Porter's motions and issued an order denying the motion to dismiss the indictment and to suppress the evidence of the gun once the stop was made. ROA.103. The court reserved ruling on the validity of the stop pending further briefing. ROA.103. *See* ROA.104-07 (Gov't supplemental brief); ROA.108-19 (Porter supplemental brief). The court ultimately upheld the validity of the stop. ROA.120.

## D.  Porter Is Convicted in a Bench Trial and Is Sentenced

Upon motion of the defendant, the court conducted a bench trial that resulted in Porter's being found guilty of possessing a machinegun, as

prohibited by 18 U.S.C. § 922(o). *See* ROA.121-22 (motion); ROA.123

(waiver of jury trial); ROA.125-27 (stipulations); ROA.304-07 (bench trial).

After adopting the presentence report, the court sentenced Porter to

46 months of imprisonment, to be followed by three years of supervised

release, along with a $3,000 fine and a $100 special assessment. ROA.352-

63, 375-80 (sentencing hearing). *See* ROA.136-42, R.E.7 (amended

judgment).  This appeal followed.

## SUMMARY OF THE ARGUMENT

1.     In answering an alert based on a signal from a license plate

reader for a car driven by the defendant who was wanted for aggravated

assault, a local police officer legally pulled over the driver.  The district

court properly accepted the officer's testimony that a Glock pistol with a

machinegun conversion device was visible under the driver's seat.  Based

on his assessment of the witness, the court declined to suppress the

weapon, which an inventory of the car would have disclosed in any event.

2.     With limited exceptions, federal law makes it unlawful to

possess a machinegun. 18 U.S.C. § 922(o).  Porter was charged with

violating that law by possessing a Glock pistol with a machinegun conversion device. The district court appropriately held that the Second Amendment does not apply to guns equipped with machinegun conversion kits, which are highly lethal, especially given the unwillingness of courts to hold that machineguns qualify for Second Amendment protection.

## ARGUMENT

## I.      The District Court Properly Refused to Suppress the Firearm

### A.      Standard of Review

As this Court has said: "When reviewing the denial of a motion to suppress, we review questions of law *de novo* and findings of fact for clear error." *United States v. Garcia*, 99 F.4th 253, 266 (5th Cir. 2024) (internal quotation marks and citation omitted). The evidence is "viewed in the light most favorable to the Government, as the prevailing party below." *Id.* "In reviewing the district court's decision, we may consider all of the evidence presented at trial, not just that presented before the ruling on the suppression motion." *Id.* (internal quotation marks and citation omitted).

"We will uphold the district court's ruling 'if there is any reasonable view of the evidence to support it.'" *United States v. Alvarez*, 40 F.4th 339, 344 (5th Cir. 2022) (quoting *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021)).

"When the denial of a motion to suppress is based on live testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Jefferson*, 89 F.4th 494, 502 (5th Cir. 2023) (internal quotation marks and citation omitted). "Where testimony conflicts with video evidence, our court must view the facts in the light depicted by the videotape," but when the video evidence is "ambiguous," no such consideration applies. *United States v. Anderson*, 2024 WL 2829243, at *1 (5th Cir. 2024) (unpublished per curiam) (internal quotation marks and citation omitted).

### B.    Applicable Law

"The 'touchstone of Fourth Amendment analysis is reasonableness.'" *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (per curiam) (quoting *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc)). As the

Supreme Court has explained, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). *See United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981) ("[o]f course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct"); *United States v. Ochoa*, 667 F.3d 643, 649 (5th Cir. 2012) ("The officer making the arrest need not have direct knowledge of all of the facts establishing probable cause, as long as he has communicated with the officer who does.").

During such a stop, police are entitled "to seize evidence in plain view if they are lawfully in the position from which they view the evidence, the incriminating nature of the evidence is immediately apparent, and the officers have a lawful right of access to the evidence." *United States v. Trevino*, 989 F.3d 402, 404 n.2 (5th Cir. 2021). Following a stop: "Once the vehicle was properly seized, an inventory search is valid if

it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *United States v. Walker*, 49 F.4th 903, 909 (5th Cir. 2022) (internal quotation marks and citation omitted).

### C.  The Suppression Hearing and the Ruling

As described above and as developed at the suppression hearing, a Gautier police officer responded to an alert from a tag reader that a Ford Focus associated with criminal activity was in his vicinity. ROA.204-05. The alert was accompanied by a photo of the car and the tag. ROA.206. The dispatcher confirmed that the alert was based on a warrant for Porter for aggravated assault. ROA.207. *See* ROA.125-26 (stipulation).  During his interaction with Porter following the stop, the officer observed what he recognized as a Glock pistol with a machinegun conversion device, which he knew to be illegal. ROA.209-10; GX (7:35).  Following Porter's arrest, the Ford Focus was subjected to a routine inventory search. ROA.215-16.

In denying on the suppression motion, Judge McNeel ruled that "Officer Hoggard, had reasonable suspicion to initiate the traffic stop based solely on the automatic license plate reader, or the ALPR, hit that revealed an outstanding arrest warrant" for Porter. ROA.267.  The judge concluded that a license plate alert "does not need to include a physical description of the driver to provide an officer reasonable suspicion to initiate a traffic stop." ROA.267.  The judge said, "under the collective knowledge doctrine, the ALPR was reliable and provided Officer Hoggard with reasonable suspicion to initiate the traffic stop." ROA.267.

The court accepted that, once Porter was stopped, the officer could see the "Glock with a switch" in plain view. ROA.166.  The officer "testified under oath that he saw the firearm sticking out from under the seat during his initial interaction with Mr. Porter" and that he could see the illegal switch. ROA.167.  The judge noted that the officer had "a clear view of the driver's seat on more than one occasion." ROA.168.  The judge observed that the Glock's distinctive gold or "light tan" color made it stand out, along with "the switch itself," which is "silver, almost chrome, very shiny."

ROA.169. When the officer later retrieved the gun, he was "reaching in to grab something specific." ROA.169. "There is no rummaging around." ROA.169. "It is a very quick darting motion straight down to pick something up." ROA.169-70. The judge also noted that the officer did not have to reach far under the seat to grab the gun. ROA.170. Because the officer was able retrieve the weapon "without having to manipulate other objects," the judge concluded that it was in plain view. ROA.171.

The court concluded that, in any event, the gun would have been discovered inevitably during an inventory of the car. ROA.174. The judge cited the officer's testimony that the Gautier Police Department has a written inventory policy that calls for a vehicle to be searched whenever a person is placed under arrest and the vehicle is to be towed. ROA.174-75.

## D. Discussion

Having evaluated first-hand the evidence at the suppression hearing, including the testimony of Lieutenant Hoggard, Judge McNeel's conclusion that the officer acted reasonably under all the circumstances is entitled to considerable deference. *See United States v. Robinson*, 741 F.3d

588, 594 (5th Cir. 2014); *Alvarez*, 40 F.4th at 344.  The court also was aptly satisfied with the basis for the stop.

> **1.    The License Plate Reader Was a Lawful Means for Determining Porter's Whereabouts**

Judge McNeel appropriately held that using a license plate reader was an entirely lawful means of locating Porter, who was wanted in another Mississippi jurisdiction for aggravated assault. ROA.267.  Here, the Gautier police officer received an alert based on a plate reader that provided him a photo of the white Ford Focus and its license plate. ROA.204-05.  The court properly regarded this as sufficiently specific information to identify the car. ROA.269-70.

This Court has recognized that such alerts—also known as "be on the lookout" (BOLO) reports—"may provide the reasonable suspicion to justify an investigatory stop." *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999) (citing *Hensley*, 469 U.S. at 231-33).  The alert here "provide[d] a sufficient basis for an investigatory stop" based on "the credibility and reliability" of the arrest warrant information from another Mississippi jurisdiction, "the specificity of the information" identifying the

car, the ability of Officer Hoggard to match the information, and the fact that the information related to an active warrant. *Id*. (citing *Alabama v. White*, 496 U.S. 325, 328-32 (1990)).

Based on the location information, the officer was able to readily identify the car Porter was driving. ROA.205.  When the officer ran the tag, he was able to identify two owners—one likely matching Porter. ROA.320-21.  As Judge McNeel noted, the outcome did not turn on whether Porter was "the owner of the vehicle because Officer Hoggard [was] getting information from more than one source that [Porter] [was] associated with this vehicle." ROA.271.  Any such potential disparity "does not negate the reasonableness" of Officer Hoggard's decision to pull over the car matching the description he was given. *Kansas v. Glover*, 589 U.S. 376, 381 (2020). *See United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) ("[r]easonable suspicion is a low threshold") (internal quotation marks and citation omitted).

Even accepting that a higher level of specificity is required for cases involving an outstanding warrant for completed criminal activity, Officer

Hoggard had sufficiently specific information to lawfully effect Porter's arrest.  The officer knew the make and model of the car, its license plate number, its approximate location, and that Porter was wanted for arrest for aggravated assault. ROA.204-08.  This was far from the generalized information that was deemed insufficient in *Alvarez* and the other authority upon which Porter relies. Br. 10-11.  Officer Hoggard acted reasonably in responding to the alert.

### 2. The Police Were Authorized to Conduct an Investigatory Stop Based on the Outstanding Warrant

As Lieutenant Hoggard testified, as soon as he received the alert from the plate reader, he immediately contacted his dispatcher who confirmed that the alert was for Porter who was wanted for aggravated assault. ROA.207.  Judge McNeel properly relied on this testimony in determining that the officer had a sufficient basis to conduct an investigatory stop. ROA.159-63.

The district court appropriately determined that the Gautier police officer could rely on the Crystal Springs arrest information that was the basis for the warrant. ROA.161-62 (citing *United States v. Rodriguez*, 564 F.3d

735, 742 (5th Cir. 2009)).  As this Court has recognized: "Officers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin or a radio dispatch, if the information is based on 'articulable facts supporting a reasonable suspicion that the wanted person has committed an offense.'" *Alvarez*, 40 F.4th at 352 (quoting *Hensley*, 469 U.S. at 232).  In this case, Officer Hoggard was entitled to rely on his having verified that the alert was based on a Crystal Springs arrest warrant issued for Porter for aggravated assault.  Nothing further was required.

### 3.  The District Court's Finding that the Officer Saw the Weapon in Plain View Is Entitled to Deference

Based on his assessment of the suppression hearing testimony, the district judge was entitled to accept that Officer Hoggard saw the Glock and its accompanying switch in plain view early in his encounter with Porter. ROA.168 ("I do find Officer Hoggard's testimony to be credible."). *See Jefferson*, 89 F.4th at 502 (emphasizing district judge's "opportunity to observe the demeanor of the witnesses" in applying the clearly erroneous standard); *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) ("One of

the most important principles in our judicial system is the deference given

to the finder of fact who hears the live testimony of witnesses because of

his opportunity to judge the credibility of those witnesses.") (internal

quotation marks and citation omitted).

The officer testified that he first noticed "[a] firearm sticking out

from under the seat" when he was placing items from Porter's patdown

onto the driver's seat. ROA.209. *See* Figure 1 *supra* (GX 1—3:00). The officer

testified that what he saw "was just the slide and the barrel and then the—

little silver switch on the back of it." ROA.210.

With the Ford Focus lawfully stopped, as the court held, Lieutenant

Hoggard "had a clear view of the driver's seat." ROA.163. The court was

entitled to accept the officer's testimony "that the barrel was sticking out

from under the seat, so he saw it in plain view." ROA.168-69. Based on the

officer's seeing the switch attached to the gun, the court properly

concluded that "the incriminating nature of the item was immediately

apparent." ROA.171. Given the testimony, the district court properly

concluded that the Glock—along with its accompanying machinegun

conversion kit—was subject to seizure under the "plain view" exception that "allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent;' and (4) the police had a lawful right of access to the item." *United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010) (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990)).

Porter relies on the body camera video to challenge the judge's acceptance of the officer's testimony that he could readily see the gun and switch. Br. 24. According to Porter, the video "reveals the ***officer's view*** of the driver's side seat" (Br. 24) (emphasis added), but the video plainly shows that the body camera was situated in a static position near the torso of the officer and did not capture the vantage point of the officer who also could rotate his field of vision.[3] *See* n.2 *supra*.

---

[3] To illustrate his point challenging the body camera's inability to record any evidence of the gun, Porter chooses a frame from the videotape that is well past when the officer testified he first saw the gun. *Compare* Br. 24 (GX 1—4:42) *with* Figure 1 *supra* (GX 1—3:00). During the interim, the officer had multiple occasions to view the interior of the car. *See* GX 1 (3:00-4:42).

As one district court observed about a similar situation, "the body camera is positioned—on [the officer']s torso, and thus does not capture what [he] could see from an eye-level angle." *United States v. Stuckey*, 2025 WL 34816 at *2 (N.D. Iowa 2025). *See also United States v. Gray*, 2021 WL 2209462, at *2 (D.D.C. 2021) ("Because the body-worn cameras focus only straight ahead and are lower than the officers' sight-line, the camera does not capture everything that each officer sees."); *United States v. Rowson*, 652 F.Supp.3d 436, 444 (S.D.N.Y. 2023) ("body camera footage sometimes does not pick up on nuances visible to the naked eye, including based on the different distances and angles involved, and that the camera may not have focused on the same, precise part of a suspect's anatomy as did the officers").

Because of the limitations inherent in the body camera video, the inability to see the weapon extending from under the driver's seat does not undermine the officer's testimony to the contrary. *See, e.g., United States v. Riggins*, 2023 WL 2964408, at *1 (5th Cir. 2023) (unpublished per curiam) ("Even if the body camera recording does not clearly show that the syringe

was visible inside Riggins's pocket, we see nothing in the recording that plainly contradicts the district court's finding that the officer saw the syringe in plain view."). Accordingly, this Court should defer to the district judge's credibility determination. Porter also seeks to capitalize on the officer's not seizing the gun immediately from the unlocked car. Br. 38. But the video shows no traffic on the side street where Lieutenant Hoggard was joined by another patrol car. *See* GX 1.

Based on the illegal machinegun conversion device attached to the gun, Judge McNeel appropriately determined that "the incriminating nature of the item was immediately apparent." ROA.171. *See Rodriguez*, 601 F.3d 407 (plain view requirement that the incriminating nature of the item be immediately apparent). As the judge explained in ruling on the suppression issue, "a Glock switch is illegal," describing it as "a device that allows a conventional semiautomatic Glock pistol to function as a fully automatic firearm." ROA.172. Thus, the officer was entitled to seize the machinegun in plain view.

### 4. In Any Event, the Gun Would Have Been Discovered During an Inventory of the Car

Judge McNeel properly ruled that the weapon would have been discovered in any event during the inventory search that followed Porter's arrest. ROA.175-76.  The judge determined that the Gautier Police inventory policy called for the search of Porter's car following his arrest, thus the weapon would have been located and was admissible in accordance with the inevitable discovery doctrine. ROA.175. *See Walker*, 49 F.4th at 909 (upholding denial of motion to suppress based on inevitable discovery resulting from inventory search).

Given that Porter was the sole occupant of the car, the Ford Focus was subject to towing and its contents inventoried as provided by the Gautier Police standard written protocol. ROA.215-17 (officer describing policy).  Judge McNeel properly ruled that the inventory search was conducted in conformity with this Court's requirements. ROA.175 (citing *United States v. McKinnon*, 681 F.3d 203, 210 (5th Cir. 2012)). *See also Walker*, 49 F.4th at 909.  Nothing Porter says (Br. 29-31) offers any basis for challenging this conclusion.

**II.    The District Court Appropriately Held that a Glock with a Machinegun-Conversion Kit as Referred to in 18 U.S.C. § 922(o) Is Not Protected by the Second Amendment**

**A.    Standard of Review**

Porter preserved the right to contest the constitutionality of prohibiting the possession a Glock with a machinegun-conversion kit on direct appeal by raising the claim in the district court in his motion to dismiss the indictment. *See Class v. United States*, 583 U.S. 174, 178-79 (2018); *United States v. Gil*, 2024 WL 2186916, at *2 (5th Cir. 2024) (unpublished per curiam) (citing *Class*, 583 U.S. at 178-79).  As this Court has said: "We review preserved challenges to the constitutionality of a criminal statute *de novo*." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014). *See United States v. Portillo-Munoz*, 643 F.3d 437, 439 (5th Cir. 2011) (same).

This Court has said: "When a litigant brings both facial and as-applied challenges, we generally decide the as-applied challenge first because it is the narrower question." *Ostrewich v. Tatum*, 72 F.4th 94, 104 (5th Cir. 2023), *cert. denied*, 144 S.Ct. 570 (2024).  "To sustain a facial challenge, 'the challenger must establish that no set of circumstances exists

under which the statute would be valid.'" *United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). If a statute is constitutional as applied to a defendant's individual case, a facial challenge will also necessarily fail. *Id.*

## B. Applicable Law

Among the protections secured by the Bill of Rights is "the right of the people to keep and bear arms." U.S. CONST. amend. II. As the Supreme Court has explained, however, the Second Amendment right is "'not a right to keep and carry any weapon whatsoever.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). According to the Supreme Court, the Second Amendment does not protect the possession of "dangerous and unusual weapons." *Bruen*, 597 U.S. at 21 (citation omitted).

Federal law makes it "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o). The National Firearms Act defines the term "machinegun" as any gun that can shoot more than one shot "by a single function of the trigger." 26 U.S.C. § 5845(b). The statute defines the

term to include "any part … or combination of parts designed and intended, for use in converting a weapon into a machinegun." *Id. See* 18 U.S.C. § 921(a)(24) (incorporating definition from Title 26).

## C. Consideration of the Issue Below

Judge McNeel offered various reasons for holding that 18 U.S.C. § 922(o) does not infringe the Second Amendment right to bear arms, including as applied to the machinegun-conversion device attached to the Glock pistol in this case. ROA.179-91. The judge first looked to this Court's case law declaring machineguns ineligible for Second Amendment protection. ROA.180-81 (citing *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)). Even apart from *Hollis*, Judge McNeel was persuaded that machineguns do not qualify for inclusion within the arms covered by the Second Amendment because they are sufficiently "dangerous and unusual" as to be unsuitable "as a weapon of self-defense." ROA.183, 189. *See* ROA.189 ("when using a machine gun, a shooter can, without reloading, fire more than 1,000 rounds per minute allowing a shooter to kill dozens of people within a matter of seconds"). The court was persuaded that machineguns are sufficiently dangerous as to not enjoy Second Amendment protection.

**D.    Discussion**

This Court's precedent remains binding that machineguns are not entitled to protection under the Second Amendment, thus foreclosing Porter's claim.  Such a claim is meritless in any event.

> **1.    This Court's Precedent Holds that Machineguns Are Not Entitled to Second Amendment Protection, Foreclosing Porter's Claim**

This Court has squarely considered and rejected the argument that machinegun possession deserves Second Amendment protection in *Hollis*, which remains binding precedent in this circuit.  There, the Court carefully surveyed the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), among other authorities, and concluded that machineguns "do not receive Second Amendment protection," meaning Section 922(o) does not violate the Second Amendment. *Hollis*, 827 F.3d at 451. *See also Bezet v. United States*, 714 Fed.Appx. 336, 340-41 (5th Cir. 2017) (unpublished) (applying *Hollis* to reject a Second Amendment challenge to Section 922(o)); *United States v. Ovalle*, 2024 WL 4678881, at *1 (5th Cir. 2024) (unpublished per curiam) (summarily affirming denial of

Second Amendment challenge based on concession that the claim is foreclosed by *Hollis*).

Porter maintains that the Court should disregard *Hollis* in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *See* Br. 41-45. But this circuit is faithful to its rule of orderliness, under which "only an intervening change in the law (such as by a Supreme Court case) permits a subsequent panel to decline to follow a prior Fifth Circuit precedent." *United States v. Alcantar*, 733 F.3d 143, 145-46 (5th Cir. 2013). An intervening change in the law "must be ***unequivocal***." *Id.* (emphasis added).

Nothing in *Bruen* unequivocally overruled *Hollis*. *Bruen* addressed a New York law limiting the ability of law-abiding citizens to carry ***handguns*** outside the home. 597 U.S. at 13-14. But *Bruen* said nothing about whether machineguns deserve Second Amendment protection. If anything, *Bruen* serves to reaffirm *Hollis* by explaining that there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). Because

nothing in *Bruen* unequivocally overruled *Hollis*, this Court is "not at liberty to overrule [its] settled precedent" in *Hollis. Alcantar*, 733 F.3d at 146.  In sum, Porter's Second Amendment challenge to Section 922(o) is foreclosed and should be rejected.

> ### 2.     In Any Event, Porter's Second Amendment Claim Is Without Merit

Even if *Hollis* were deemed to not squarely foreclose Porter's claim, this Court should nonetheless affirm because *Hollis*'s holding—that machineguns are not protected by the Second Amendment—is correct. Although the Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed," U.S. CONST. amend. II, the Supreme Court has recognized an "important limitation on the right to keep and carry arms"—namely as encompassing "the sorts of weapons … 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  The Court in *Heller* explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at at 625.

Courts are not to look at the Second Amendment's text in isolation but instead are to consider the text "according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 28. According to *Heller*, the Founders did not understand the right to keep and bear arms as "a right to keep and carry ***any*** weapon whatsoever," but only as a right to possess firearms "in common use at the time."[4] 554 U.S. at 626-27 (internal quotation marks and citation omitted) (emphasis added).

Machineguns are not protected by the Second Amendment because they are not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, but instead are typical of the tools of the trade of those operating outside the law.[5] Section 922(o) counts among its

---

[4] This common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. The Supreme Court did not change the common-use or dangerous-and-unusual-weapons aspects of *Heller* when it issued *Bruen*. Instead, the Court in *Bruen* reaffirmed *Heller*'s conclusion that there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" and that the Second Amendment protects the possession and use of weapons "'in common use at the time.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627, and citing 4 W. Blackstone, *Commentaries on the Laws of England* 148-49 (1769) and quoting *Miller*, 307 U.S. at 179)).

[5] Since *Heller*, multiple courts of appeals have upheld § 922(o) on this basis. *See United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *United States v. One (1) Palmetto*

primary purposes "to make it more difficult for the gangster element to obtain certain types of weapons." *Haynes v. United States*, 390 U.S. 85, 87 n.4 (1968) (citing H.R. REP. No. 914, 86th Cong., 1st Sess., at 2).

The unique characteristics of machineguns place them outside the category of weapons typically owned for law-abiding purposes. Machineguns are extraordinarily lethal. Courts have recognized "[t]he immense danger posed by machineguns." *United States v. O'Brien*, 560 U.S. 218, 230 (2010). *See United States v. Lopez*, 2 F.3d 1342, 1356 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995) ("Section 922(o) is restricted to a narrow class of highly destructive, sophisticated weapons"); *United States v. Golding*, 332 F.3d 838, 840 (5th Cir. 2003) (citing the "risk … presented by the inherently dangerous nature of machine guns"). *See also United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (referring to Congressional finding

_____

*State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3rd Cir. 2016); *Hollis*, 827 F.3d at 451; *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (observing that "[a] machine gun is 'unusual'" and that "[o]utside of a few government-related uses, machine guns largely exist on the black market"); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (challenge to Section 922(o) was "foreclosed" by *Heller*'s statement that "'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes'"); *United States v. Zaleski*, 489 Fed.Appx. 474, 475 (2d Cir. 2012) (unpublished) (same).

including machineguns among destructive devices that qualify as

"'primarily weapons of war and have no appropriate sporting use or use for personal protection.'") (quoting S. REP. No. 90-1501, at 28 (1968)).

As Judge McNeel observed, machineguns do not qualify for inclusion within the arms covered by the Second Amendment because they are sufficiently "dangerous and unusual" as to be unsuitable "as a weapon of self-defense." ROA.183, 189. *See* ROA.189 ("when using a machine gun, a shooter can, without reloading, fire more than 1,000 rounds per minute allowing a shooter to kill dozens of people within a matter of seconds"). *See Henry*, 688 F.3d at 640 (similarly describing lethality of machineguns); *id.* (with few exceptions, the court could "conceive of few weapons that are more dangerous than machine guns").

Moreover, machineguns are "specially adapted to unlawful uses." *Friedman v. City of Highland Park*, 136 S.Ct. 447, 449 (2015) (Thomas, *J.*, dissenting from denial of *certiorari*). *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116-17 (10th Cir. 2024) (observing that "the Second Amendment does not extend to weapons" that are "adapted for unlawful

uses"). As Congress has observed, machineguns are "used readily and efficiently by criminals or gangsters," H.R. REP. No. 83-1337, at A395 (1954), and are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," H.R. REP. No. 99-495, at 4 (1986).

Because it prohibits possession only of firearms that are not typically possessed by law-abiding citizens for lawful purposes, Section 922(o) is "consistent with the principles that underpin [the Nation's] regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). As *Heller* explained, the "common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citing nearly a dozen historical sources). Thus, *Heller* has already authoritatively established this principle.

In any event, an array of historical laws confirms the principle that *Heller* recognized. In England, the 1328 Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.). *See Bruen*, 597 U.S. at 41-45.

This statute was understood to provide that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787). *See Rahimi*, 602 U.S. at 697-98. In this way, the statute was consistent with the common law offense of "affray," which included cases "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

The American colonies likewise "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). Early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the

people."[6]  Colonial Massachusetts (1692) and New Hampshire (1701)

codified this authority, providing that justices of the peace could arrest "all

affrayers … and such as shall ride, or go armed offensively … by night or

by day, in fear or affray of their majesties' liege people."[7]  In the late-18th

century, the Commonwealth of Virginia (1786) similarly provided that no

person shall "ride armed by night nor by day … in terror of the Country,"[8]

and the Commonwealth of Massachusetts (1795) later again directed

justices of the peace to arrest "all affrayers … and such as shall ride or go

armed offensively, to the fear or terror of the good citizens of this

Commonwealth."[9] Confirming that these early laws targeted not just

---

[6] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Office*r, 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[7] Act of Nov. 1, 1692, ch. 18, § 6, in 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, in 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor, ed., 1904).

[8] Act of Nov. 27, 1786, ch. 21, in *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[9] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

"terror" but also dangerousness, the province of East New Jersey (1686) prohibited the concealed carry of "unusual and unlawful weapons."[10] Although these statutes contemplated that an affray required "something more" than merely carrying any firearm in public, *Bruen*, 597 U.S. at 50, they contemplated that it would naturally constitute affray to carry dangerous and unusual weapons, *id*. at 46-47.

Section 922(o) is consistent with the principles underlying this longstanding tradition of firearm regulation. English and American jurisdictions restricted the carrying of dangerous and unusual weapons even before the Founding era. *See Rahimi*, 602 U.S. at 691. States restricted a variety of such weapons throughout the 1800s, apparently without "disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30. Section 922(o) is therefore part of a tradition of weapons regulation that goes back to the Founding. And this longstanding tradition shows that the Government may ban firearms not typically possessed by law-abiding

---

[10]  An Act Against Wearing Swords, &c., ch. 9, in Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

citizens for lawful purposes, such as dangerous and unusual weapons. The

Glock pistol with the machinegun conversion device that Porter had in his

position is just such a weapon that is not protected by the Second

Amendment.

## CONCLUSION

For the foregoing reasons, the judgment of conviction and

sentencing should be affirmed.

Respectfully submitted,

PATRICK A. LEMON
*Acting United States Attorney*
*Southern District of Mississippi*

By:     /s/ *Gaines H. Cleveland*

GAINES H. CLEVELAND
Mississippi Bar Number 6300
*Assistant United States Attorney*

HUNTER L. MCCREIGHT
Georgia Bar Number 728770
*Assistant United States Attorney*
1575 Twentieth Avenue
Gulfport, Mississippi 39501
Dated: September 18, 2025    Telephone: (228) 563-1560

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this day, he caused to be electronically filed a copy of the Brief for Appellee United States of America with the Clerk of the Court using the ECF system, which caused the brief to be served on counsel of record.

CERTIFIED, this the 18th day of September 2025.

/s/ *Gaines H. Cleveland*
GAINES H. CLEVELAND
*Assistant United States Attorney*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 7,085 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the typestyle requirements of FED. R. APP. 32(a)(6) because the brief has been prepared using Palatino Linotype 14-point font produced by MS Word software; the footnotes are in 12-point type.

3.      Privacy redactions required by FIFTH CIR. R. 25.2.13 have been made to this brief.

4.      The electronic submission of this brief is an exact copy of the paper document as required by FIFTH CIR. R. 25.2.1.

5.      This brief has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

CERTIFIED, this the 18th day of September 2025.

/s/ *Gaines H. Cleveland*
_____
GAINES H. CLEVELAND
*Assistant United States Attorney*